No. 89,662

STATE OF KANSAS, *Appellee,* v. ETHAN M. GRIFFIN, *Appellant.*
112 P.3d 862

Opinion filed June 3, 2005.

*Reid T. Nelson*, capital appellate defender, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, assistant attorney general, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Ethan Griffin appeals his convictions of two counts of felony murder, five counts of aggravated battery, and two counts of burglary. He was sentenced to two consecutive life terms (each with no parole eligibility for 20 years) plus 72 months consecutive to the life terms.

This case is a companion case to *State v. Dixon*, 279 Kan. 563, 112 P.3d 883. The convictions of Griffin and Dixon arose out of an explosion and apartment fire, which occurred in Emporia in July 2001. Dixon and Griffin were coparticipants in the crimes charged but were not tried together. Griffin testified as a witness for the State in Dixon's trial. He did not testify in his trial. The facts surrounding the explosion and fire are set out in *Dixon*, 279 Kan. at 565-68, and will not be set out in detail in this opinion except as may be necessary in discussing issues not raised and discussed in *Dixon*.

Griffin raises 10 issues on appeal. Five of them are similar to issues raised by Dixon.

## 1. WAS GRIFFIN DEPRIVED OF A FAIR TRIAL BY THE STATE'S USE OF INCONSISTENT PROSECUTORIAL THEORIES TO CONVICT HIM AND WALLACE DIXON OF THE SAME CRIMES?

Griffin makes two claims of prosecutorial inconsistency between his trial and Dixon's. First, he contends that he was portrayed as truthful in Dixon's trial, where he testified for the State, and as less than truthful in his own trial. Second, he contends that his participation in the second burglary of Alicia Shaw's apartment was played down in Dixon's trial and up in his own.

The State argues that this issue is not properly before the court because it is raised for the first time on appeal. Griffin does not contend that the issue was raised at trial, but he states that it was argued at the remand hearing on ineffective assistance of counsel.

Examination of the transcript of the remand hearing at the pages cited by Griffin shows that the issue presented to the trial court was whether trial counsel should have had Griffin testify. The argument was made at that time by appellate counsel that inconsistencies between Dixon's and Griffin's trials could have been avoided if trial counsel had convinced Griffin to testify on his own behalf. Inconsistent prosecutorial theories were not an issue presented to the trial court so as to provide an opportunity to avoid or correct error.

As a general rule, issues not raised before the trial court will not be considered on appeal. *State v. Williams*, 275 Kan. 284, 288, 64 P.3d 353 (2003). There are several exceptions to the general rule, including where consideration of the question raised for the first time on appeal is necessary to serve the ends of justice or to prevent denial of fundamental rights. *State v. Wiegand*, 275 Kan. 841, 844, 69 P.3d 627 (2003). Griffin does not argue for exercising an exception in the circumstances of this case. We do not address the issue.

## 2. WAS GRIFFIN DEPRIVED OF A FAIR TRIAL BY THE PROSECUTOR'S MISSTATING THE EVIDENCE AND THE LAW IN CLOSING ARGUMENT?

Griffin contends that the convictions against him were obtained, at least in part, by prosecutorial misconduct in closing argument. An appellate court's standard of review is the same whether or not an objection was made at trial. *State v. Davis*, 275 Kan. 107, 121-22, 61 P.3d 701 (2003). "Reversible error predicated on prosecutorial misconduct must be of such a magnitude as to deny a defendant's constitutional right to a fair trial." *State v. Pabst*, 268 Kan. 501, 504, 996 P.2d 321 (2000).

We use a two-step process in analyzing allegations of prosecutorial misconduct. First, the court determines whether complained-of comments were outside the wide latitude permitted a prosecutor for language and manner. Second, the court determines whether the prosecutor's remarks constitute plain error, that is, whether the statements are so gross and flagrant as to prejudice the jury against the defendant and deny the defendant a fair trial. 275 Kan. at 121.

(a) <u>Evidence</u>. Griffin contends that, because the evidence was that Dixon knocked over the stove, it was incorrect for the prosecutor to state that defendant's acts were responsible for the deaths of Dana and Gabriel Hudson. Griffin complains of the following statements:

"Dana and Gabriel Hudson died that night. They died because of the defendant's acts along with Wallace Dixon and he should be held responsible for that."

"We know the defendant was inside that apartment, him and Wallace Dixon, and that they caused a leak in this pipe that ultimately exploded killing Dana and Gabriel. Nothing else caused it."

The prosecutor's statements conform to the well-established principles of aiding and abetting. The court has long recognized that all participants in a crime are equally guilty of that crime and any other reasonably foreseeable crime committed in carrying out the intended crime. See *State v. Turner*, 193 Kan. 189, 196, 392 P.2d 863 (1964); PIK Crim. 3d 54.05 and 54.06.

The prosecutor told the jury that Griffin admitted burglarizing Alicia Shaw's apartment, but Griffin contends that he did not admit burglarizing the apartment on the second entry. He complains of the following statements:

"But that's what happened and that's what he admitted to. He went in the apartment. He committed a burglary and it was during the course of that burglary the place blew up."

"We brought you the defendant admitting going into the apartment, burglarizing it, and what Wallace Dixon did."

The State concedes that Griffin never said that he burglarized the apartment on the second entry; he did admit to entering the apartment with Dixon. The State contends that Griffin's entering the apartment a few hours earlier and stealing property raised the inference that he intended to do the same when he entered the apartment the second time. Intent, a state of mind existing at the time an offense is committed, does not need to be and rarely can be directly proven. It may be established by acts, circumstances, and inferences reasonably deducible from the evidence of acts and circumstances. *State v. Wilkins*, 269 Kan. 256, 264-68, 7 P.3d 252 (2000). In the absence of proof of other intent, or an explanation

of an unlawful breaking and entry into the dwelling of another at night, it reasonably may be inferred that the intruder intended to commit a felony, theft, or sexual battery therein. In *Wilkins*, although the court reversed the defendant's conviction of burglary on double jeopardy grounds, it held that the evidence was sufficient to convict defendant of burglary where he was found in a pawn shop, having broken in through a hole in the roof. 269 Kan. at 264. In the present case, too, there is no other explanation for Griffin's second unlawful entry into the apartment, and from the evidence of his conduct in the first entry it reasonably may be inferred that he intended to resume his thievery in the second entry.

Griffin complains of two aspects of the following statements about how the apartment was going to be blown up:

"You heard what [Griffin] said about Wallace Dixon's intent, I'm going to burn that house down, I'm going to blow that apartment up. He chose. He chose to stay there. Even when Rodney Hayes, his best friend, said I'm done, I'm done, he shot at me, he wants to blow up a house, I'm done, we're going over to Donnie Wishon's . . . ."

"The defendant made yet another choice, I'm going to go with Wallace Dixon. And when he did so he knew Wallace Dixon's intent. Because as you heard him say, he knew Wallace was intending to blow up that apartment. He knew and yet he made the choice."

Griffin claims that there was no evidence that Dixon said anything about an explosion. Griffin himself, however, told police that Dixon was talking like he would blow the house up. Griffin also complains that the prosecutor improperly changed the term "house," which was in evidence, to "apartment," which was not. The significance of the latter, according to Griffin, is that Dixon's referring to an apartment would have been a clearer expression of his intent. There is no need, however, to impute Dixon's intent to Griffin because the jury reasonably could have inferred that Griffin intended to commit theft when he entered Alicia Shaw's apartment the second time.

(b) Law—aiding and abetting. Griffin complains that the prosecutor told the jurors, contrary to established law, that his mere association with Dixon was sufficient to establish his guilt of felony murder. He identifies the following statements:

"[Dixon] had the reasons to do this. But the defendant went along. The defendant aided Wallace Dixon for, you see, ladies and gentlemen, when you go into a place like this when you're going to commit a crime[,] is it easier to do it alone or with someone else[?] We know this defendant is the one who crawled through the window and cut himself the night during the first burglary. It's easier to do it with a group. That encourages bad behavior, that's common sense.

"Would Wallace Dixon have done this alone had the defendant not helped him? We'll never know."

"No one forced him to enter that apartment to help Wallace Dixon, to aid, to encourage, to help Wallace Dixon. No one made him do it, it was his choice to do so. And regardless of the extent of his participation, you heard him start out with the police denying any participation and ultimately he got to the point where he admitted it. But regardless of that, a person who intentionally aids, abets is guilty of the primary crime."

In neither of these excerpts did the prosecutor tell the jury that mere association was sufficient for conviction. These remarks do not touch on Griffin's own intent in reentering the apartment. As we have seen in the preceding paragraphs, the prosecutor urged the jurors to infer from all the evidence that Griffin reentered the apartment with a felonious intent. The State's position was not that Griffin was guilty by mere association, and these excerpts do not suggest that it was.

(c) Law—intended consequences. Griffin contends that the prosecutor asked the jurors to misapply the law of intended consequences. He states that the theme of the State's closing argument was that, at a number of different times, Griffin chose to associate with rather than distance himself from Dixon so that he eventually was in Alicia Shaw's apartment when Dixon knocked over her stove. The prosecutor quoted the following part of the pattern instruction on intended consequences: "And the law says as you've just been instructed in Instruction Number 9 that ordinarily a person intends all of the usual consequences of their voluntary acts. It's a choice we make." Griffin contends that the prosecutor's statements were intended to convince the jury to convict him without reference to the elements of felony murder.

We find it difficult to understand Griffin's argument. It appears to be another way of arguing that, without felonious intent to reenter the apartment, Griffin was merely associating with Dixon and

the deaths were not the usual consequences of mere association. The prosecutor's statement about intending usual consequences is a correct statement of the law, and, even though the prosecutor did not restrict his use of the principle strictly to a presumption of intent, there does not seem to be anything improper about the way he used it. Hence, the prosecutor's theme and remarks do not extend beyond the wide latitude permitted a prosecutor for language and manner.

(d) <u>Law—felony-murder rule.</u> The prosecutor stated:

"The felony murder rule is simply this: The State says that in our laws that if you commit certain classes of felonies and during the commission of one of those felonies the attempt, even the attempt to commit one of those felonies, or the flight from one of those felonies and someone dies as a result of what happened, it's felony murder.

". . . So if you're — for lack of a better example, if you're just committing a burglary and you trip over something on the way out and that causes a gas leak, that's felony murder if people die."

Griffin complains that the statement leaves out the requirement that the death must occur *during* the attempt, commission of, or flight from the felony. His argument is based on an overly narrow reading of K.S.A. 21-3401, which provides that a felony murder is "the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony." A less restrictive construction of the statute prevails in the case law, where the requirement is that the killing be some part of the felony. For example, in *State v. Jacques*, 270 Kan. 173, 14 P.3d 409 (2000), the defendant's conviction of felony murder, with possession of cocaine as the underlying felony, was affirmed where he killed the person who was supposed to buy cocaine for him and then went into the drug house and made the purchase for himself. The court held:

"When applying the felony-murder rule, . . . the felony and the victim's death do not need to occur simultaneously, nor does the felony need to occur before the death. Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing was a part of the felony and therefore subject to the felony-murder rule. [Citations omitted.]

"We hold that the death need not occur during or after the commission of the felony to support a conviction for felony murder. The question for the jury is whether the death is within the res gestae of the crime, regardless of the actual sequence of events. [Citations omitted.]" 270 Kan. 189-90.

### 3. WAS THE ASSISTANCE PROVIDED BY GRIFFIN'S TRIAL COUNSEL INEFFECTIVE?

In May 2003, after his appeal had been docketed in this court, Griffin filed a motion seeking remand for a determination whether he was denied effective assistance of counsel at trial. The court granted the motion in June 2003. In a November 2003 letter, the trial judge advised the court that a hearing had been conducted and the claim of ineffective assistance denied. In December 2003, a journal entry was filed, which recites that a hearing was conducted and the defendant's request for relief was denied.

The trial judge announced his ruling from the bench at the conclusion of the hearing. He began with the general observation that defendant was represented throughout the course of the underlying trial by an attorney with "extensive trial experience in criminal cases, trying between 160 and 170 cases for the defense," who devoted 250 to 300 hours to preparing and trying the case. The trial judge also noted that Griffin's counsel watched Dixon's trial before Griffin's began. In the judge's view, "that presents to a defense trial counsel a unique perspective of literally having seen the case tried previously and being able to adopt an approach and a strategy based upon what he had seen and heard of the prior case." Here are the concluding paragraphs of the trial judge's remarks from the bench:

"I, therefore, find based upon the totality of my circumstances here that the defendant has not met its burden to demonstrate, first of all, that trial counsel's performance was deficient; secondly, even if I had so found then I must go on to the question of whether or not that conduct was prejudicial. . . . But I think I want to make it very clear for this record that even if I had taken a different view and determined that there were errors on the part of Mr. Brown, I cannot conclude under these circumstances that those errors were in any way prejudicial. To do so I would have had to find that there was a reasonable probability that the result would have been different.

"The evidence against Mr. Griffin was quite extensive. The jury gave considerable thought to that evidence and applying the evidence to the law as they were

instructed. In fact, as I recall some not-guilty decisions were rendered in this regard. I cannot see in any respect, having looked back through this case and reconsidered this matter, how a change in the defense' tactics would have altered or in any way changed the decision of the jury. Consequently, it would be my secondary finding that there was no prejudice even if one found that there was a deficient performance. Under these circumstances the request of the defendant to set aside the verdict based upon Sixth Amendment grounds of ineffective assistance of counsel is denied."

Before counsel's assistance is determined to be so defective as to require reversal of a conviction, the defendant must establish two things. First, the defendant must establish that counsel's performance was deficient. This requires a showing that counsel made errors so serious that counsel's performance was less than that guaranteed to the defendant by the Sixth Amendment to the United States Constitution. Second, the defendant must establish that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial. *State v. Davis*, 277 Kan. 309, 314, 85 P.3d 1164 (2004). Both the performance and prejudice prongs of the ineffective assistance of counsel inquiry are mixed questions of law and fact on appeal requiring de novo review. *Easterwood v. State*, 273 Kan. 361, 370, 44 P.3d 1209, *cert. denied* 537 U.S. 951 (2002).

On appeal, Griffin makes 10 claims of ineffective assistance of counsel. The State objects to the court's consideration of half of the claims on the ground that Griffin did not raise them in the district court. Griffin contends that some of the claims were presented to the district court and, even if they were not, it does not matter because this court is obligated to base its ruling on a review of the entire trial record. He cites *State v. Rice*, 261 Kan. 567, 608, 932 P.2d 981 (1997), which does not involve the question whether an instance of alleged ineffective assistance will be considered for the first time on appeal.

In *Rice*, the trial court determined that defense counsel's performance, which included advising his client for unsound reasons not to testify, was not unreasonably deficient. This court disagreed but upheld the trial court's overruling of the motion for new trial

on the ground that Rice was not so prejudiced by his attorney's deficient performance as to be denied a fair trial. 261 Kan. at 607-09. In discussing that the trial court's ruling on prejudice undoubtedly would have been negative if the second prong had been reached, this court made the following statement:

"It is apparent the trial judge was not limited to the evidence presented at the ineffective assistance hearing, but took into consideration, as we must do, the totality of the evidence before the jury. There is considerable evidence sufficient to uphold the verdict which would not have been affected by Rice's testimony." 261 Kan. at 608-09.

Taking all the evidence into consideration is not the equivalent of considering an issue for the first time on appeal.

Generally, an allegation of ineffective assistance of counsel will not be considered for the first time on appeal. *State v. Gleason,* 277 Kan. 624, 647, 88 P.3d 218 (2004). The trial court, which observed counsel's performance and was aware of the trial strategy involved, is in a much better position to consider counsel's competence than an appellate court and should be the first to make a determination of such an issue. *State v. Van Cleave,* 239 Kan. 117, 119, 716 P.2d 580 (1986). This court, however, has made exceptions in a few cases where the record on appeal was sufficiently complete for the appellate court to decide the issue. See, *e.g., State v. Jones,* 273 Kan. 756, 785, 47 P.3d 783 (2002); *State v. Carter,* 270 Kan. 426, 433, 14 P.3d 1138 (2000); *State v. Jenkins,* 257 Kan. 1074, 1079-80, 898 P.2d 1121 (1995).

(a) Griffin contends that his trial counsel should have introduced Griffin's testimony and the prosecutor's closing argument remarks about Griffin's testimony from Dixon's trial in order to show Griffin's lack of culpability. The State contends that the issue was not raised before the trial court. In his reply brief, Griffin states that it was raised and cites certain portions of the transcript of the hearing on the claim of ineffective assistance of counsel.

Examination of the specified portions of the record shows that the principal contention presented to the trial judge was that Griffin would have benefitted from testifying in his own defense. Griffin's testimony from Dixon's trial and a question the prosecutor asked Griffin, but not the prosecutor's closing remarks, are cited.

In reference to Griffin's position in testifying in his own trial, Griffin's appellate counsel asked and Griffin's trial counsel answered the following questions:

"Q. . . . What was Mr. Griffin's position on testifying?
"A. He did not want to testify.
"Q. And that would have been after consultation with you?
"A. Several consultations, yes.

. . . .

"Q. His decision not to testify after consultation with you.
"A. Yes.
"Q. Do you recall whether or not you advised him that his testimony in Dixon's trial could be beneficial to him in his own trial?
"A. I don't believe we had that conversation, no, sir."

In another instance, Griffin's appellate counsel argued that Griffin should have been advised to testify in his own defense. The trial judge stated that he "didn't hear anything about that today," and "[w]e don't have any evidence of that," to which Griffin's appellate counsel responded, "I don't have that evidence, no." Later, Griffin's appellate counsel stated, "I don't think the prosecution should be switching positions between one defendant — codefendant's culpability to obtain a conviction on the other one and then reverse it again when it's the next defendant's time for trial, and that would have plainly come out if he would have taken the stand." The last cited excerpt is a question by the prosecutor and Griffin's response, which appellate counsel commended to the trial judge as showing that in Dixon's trial the State characterized Griffin as less culpable than in his own trial. The trial judge asked Griffin's appellate counsel, "[I]s there anything that you wanted to submit in written form that you haven't already submitted either in the motion for remand or otherwise here today that you think I need to read before I can rule?" In response, Griffin's appellate counsel suggested that the trial judge read page 1890 of Dixon's trial transcript. At pages 1890-91 of Dixon's trial transcript, Griffin testified about when Hall and Hayes stayed at Donnie Wishon's house and Griffin left with Dixon. The prosecutor asked, "You were along for the ride?" Griffin answered, "I was ready to go. He asked me — I was just — I was ready to go and I was in the car, yeah."

Although the issue as framed on appeal was not clearly presented to the trial judge, the issue will be considered to the extent that it was brought to the trial judge's attention. The question would be whether trial counsel was ineffective in not introducing Griffin's testimony from Dixon's trial in Griffin's trial. The first part of the analysis is whether Griffin has established that trial counsel's performance was deficient, which requires a showing that counsel made errors so serious that his performance was less than that guaranteed by the Sixth Amendment. Such a serious error in this context would be trial counsel's failure to introduce clearly exculpatory testimony from Dixon's trial. What Griffin brought to the trial court's attention is that, in response to the question whether he was just along for the ride when he and Dixon left Wishon's residence, Griffin answered that he was ready to go. Griffin's readiness to accompany Dixon, who earlier had purchased a bucket of gasoline and spoken of burning and blowing up Alicia Shaw's apartment and had fired a number of shots at Griffin's friend's feet, indicates Griffin's readiness to associate himself with a person who intended to and did engage in criminal activity. It is not exculpatory, and trial counsel's failing to introduce it was not deficient in this regard.

(b) Griffin contends that trial counsel should have objected to and corrected misstatements of law made by the prosecutor in closing argument. Griffin refers the court to Issue 2 for the list of misstatements. As discussed in Issue 2, the prosecutor's statements that Griffin complained of were not misstatements of the law.

(c) Griffin contends that trial counsel should have more extensively cross-examined Agents Jimerson and Durastanti and Shameika Holmes. The State contends that the issue was not raised before the trial court. Griffin's response is obscure: "[M]ost of the points were clearly presented as to whether the prosecution's evidence on these points was relevant. In addition, in assessing ineffective assistance of counsel claims, this court reviews the entire record of the trial." It does not appear that the question of the cross-examination of the specified witnesses was raised for the trial court's consideration.

(d) Griffin complains that trial counsel did not object to Jimerson's and Wright's testimony about law enforcement officers' attempts to find Griffin during August 2001. They testified that, after Dixon was arrested, a warrant was issued for Griffin's arrest. They looked for Griffin at the Burger King where he had been employed and at the apartment of his girlfriend, Shameika Holmes, and they conducted surveillance of both places. They expected that Griffin would try to get his paycheck from Burger King. After Holmes picked up the check, the officers followed her to Griffin's aunt's house in Kansas City, Missouri. Griffin left the house and ran. Thirty to 45 minutes later, officers found him hiding under a bush in the 45-degree angle of a fence.

On appeal, Griffin admits that evidence of the foot chase was relevant. He does not state specifically on what ground he contends the rest of the testimony was objectionable, but his admission seems to suggest that he contends the rest of the testimony was irrelevant.

The relevance and admissibility of flight evidence is long established. See *State v. Walker*, 226 Kan. 20, 22, 595 P.2d 1098 (1979). In the recent case of *State v. Jamison*, 269 Kan. 564, 569, 7 P.3d 1204 (2000), the court stated:

"Evidence of flight may be admissible to establish the consciousness of guilt, the commission of the acts charged, and the intent and purpose for which those acts were committed. [Citation omitted.] Even where other evidence may weaken this inference of guilt, the objection to such evidence goes to the weight rather than the admissibility. [Citation omitted.]"

Hence, trial counsel's not raising a relevance objection did not constitute a deficient performance.

Griffin also contends that testimony about Shameika Holmes taking his wages to him is irrelevant and misleading. His contention, however, is based on speculation that is not borne out by the record. According to Griffin, a close reading of the following testimony shows that law enforcement officers suggested to Holmes, through Cassandra McClain, that she go to Griffin so that they could follow her:

"Q. Okay. Mr. Jimerson, when you were receiving this information in the 24 hour period prior to the defendant's arrest, did you guys have somebody

that was being a source for you as to what Miss Shameika Holmes was . . . .

"A. I'm sorry.

"Q. Did you guys have someone who was a source of information that was close to Shameika Holmes in order to be able to track or anticipate her move-ments?

"A. Yes, it was Cassandra McClain.

"Q. What was Cassandra McClain doing?

"A. She was actually driving Miss Holmes [to Kansas City] which was great assistance to us in the surveillance.

"Q. How was she passing this information to you?

"A. Agent Wright was the one that was dealing directly with her. My job was overall supervision of the surveillance.

"Q. Was she calling you during this time?

"A. She would call Agent Wright different times.

"Q. And give Agent Wright the plans?

"A. Yes, but I don't think she knew exactly where she was going. That was one of the problems, we didn't know exactly where we were going because it would have been a lot easier if we did."

Where Holmes got the idea to take Griffin's wages to him is not revealed, or even hinted at, in this testimony. There is no basis beyond speculation for Griffin's contention.

Griffin contends that his trial counsel should have objected to evidence that Griffin accompanied Dixon to see Dixon's lawyer. Griffin does not state on what ground the objection should have been made, but rather refers to the discussion of Issue 7. Issue 7 is framed as a matter of prosecutorial misconduct. As previously discussed, appellate review for prosecutorial misconduct does not depend on a contemporaneous objection.

The evidence of Griffin's accompanying Dixon to see Dixon's lawyer is set out in our discussion of Issue 7. It shows that Dixon asked Griffin to go to his lawyer's office with him. Griffin said little. There was no evidence that Griffin sought legal advice or that ei-ther Griffin or the lawyer believed there was an attorney-client relationship between them. Even if the evidence was objectiona-ble, it was brief and there would seem to be little likelihood that the jury would have inferred defendant's guilt from the evidence that Griffin went to Dixon's attorney's office at Dixon's request, said little, and established no relationship with the attorney.

(e) Griffin complains that trial counsel failed to argue that the deaths of Dana and Gabriel Hudson were not felony murders within the language of K.S.A. 21-3401(b). The statute provides: "Murder in the first degree is the killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." Burglary is an inherently dangerous felony. K.S.A. 2004 Supp. 21-3436(9). Although the State asserts that this claim was not raised in the trial court, it was in fact raised by Griffin. As already discussed with regard to Issue 2, Griffin's argument is based on an overly restrictive construction of the statute.

(f) Griffin complains that defense counsel failed to argue that there was no evidence that Griffin intended to commit a felony when he entered Alicia's apartment the second time. In fact, trial counsel argued both that there was no evidence of defendant's intent and that Griffin did not participate in Dixon's felonious conduct during the second entry. In so arguing, trial counsel made the argument that Griffin now complains he failed to make. If trial counsel vigorously argued there was a lack of evidence that Griffin aided and abetted Dixon, as Griffin concedes, and placed less emphasis on a lack of intent to commit a felony within the apartment, that is merely a matter of trial strategy. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *State v. Gleason*, 277 Kan. at 644. And, as the court stated in *State v. Orr*, 262 Kan. 312, 333, 940 P.2d 42 (1997):

"Hindsight . . . is not the vantage point from which we judge allegations of incompetence. [Citation omitted.] It may be that had defendant's counsel on appeal conducted the defense at trial, he would have done things differently. Whether or not he would have fared better before the jury is a matter of conjecture. Where experienced attorneys might disagree on the best tactics, deliberate decisions made for strategic reasons may not establish ineffective counsel. [Citations omitted.]"

(g) Griffin complains that trial counsel failed to object to the testimony of three expert witnesses—Agent Durastanti, Peter Lobdell, and Dr. Erik Mitchell.

(1) Durastanti was asked to describe his training in interviewing techniques. He also was asked about interviewing Griffin, and, based on the foundation established, at least in part, by Durastanti's testimony, the videotape of Griffin's interview was offered into evidence.

Griffin contends that trial counsel should have objected to Durastanti's testimony on the ground that it invaded the province of the jury by commenting on defendant's credibility. There is only one objectionable comment in the whole of Durastanti's testimony. He was asked and answered: "Q. Did [Griffin] appear to be able to respond intelligently and appropriately to your questions? A. Yeah. He responded appropriately for a deceptive person, someone who was hiding something, in my opinion."

The State contends that the comment was "rather superfluous" because when the jurors watched the videotape they could see for themselves that Griffin was evasive. The State's observation about Griffin's conduct during the interview is accurate to the extent that Griffin initially gave almost no information and only gradually over the hours of the interview became somewhat more cooperative. The State cites *State v. Walker*, 28 Kan. App. 2d 700, Syl. ¶ 6, 20 P.3d 1269 (2001), which states: "The mere fact that an officer testifies that the defendant lied, when it is obvious that the defendant did lie, is not cause to grant a mistrial." In response to the question what a witness had said about the man in the back seat of the patrol car, the officer stated: " 'He positively identified Robert A. Walker—well, he stated his name was Robert A. Walker, he [Walker] lied to me about his name—as being one of the individuals who was firing towards three black males.' " 28 Kan. App. 2d at 710. What the officer said in *Walker* was that the defendant had given him a false name. What Durastanti said in the present case is that the defendant was deceptive when interviewed by law enforcement. There is a difference in that Durastanti commented on defendant's lack of forthrightness while being interviewed by law enforcement agents, and the videotape of the interview was shown to the jury so that Durastanti's statement was a comment on the credibility of what Griffin told the agents. Durastanti's comment was objectionable, but defense counsel did not object to it.

Although the State's observation that Griffin's evasiveness is plainly apparent in the videotape does not make Durastanti's comment unobjectionable, it does weigh against the comment's being prejudicial. The failure to object to the comment did not prejudice Griffin.

(2) Lobdell testified about "an intentional incendiary act," "an intentional gas leak in this apartment," and that "the defendants caused that to happen inside the apartment." Griffin contends that whether the gas leak was intentional was a question of fact for the jury to decide and that trial counsel should have objected that the testimony invaded the jury's province. The trial court's view was that Lobdell's testimony was intended to communicate his observation that the break in the pipe would not have occurred in the absence of manual manipulation. It does appear that Lobdell's use of the term "intentional" was meant to communicate manual manipulation rather than criminal intent. It does not appear to have been objectionable as actually invading the province of the jury, but the testimony probably was objectionable because the particular words he used could have been misconstrued by the jurors. Lobdell's testimony, however, added nothing to what the jurors learned from Griffin's own evidence abut Dixon kicking over the stove. Thus, defendant was not prejudiced by trial counsel's failing to object to the agent's remarks.

(3) Mitchell testified that the *cause* of the deaths of Dana and Gabriel Hudson was exposure to heat and inhalation of fire gases and that the *manner* of each death was homicide. As the coroner, Mitchell completed the official death certificates for Dana and Gabriel Hudson. The certificate forms have a space for manner as well as cause of death. Mitchell's testimony was given in connection with introduction of the death certificates into evidence. The certificates are required to be filed with the state registrar and are the official death record. K.S.A. 65-2412. K.S.A. 65-2416(b) provides that "the state registrar shall not certify a death certificate in which the manner of death is marked other than natural unless the death certificate is signed by a district coroner." Mitchell, as the district coroner, was required to sign the death certificates of Dana and Gabriel Hudson, and, as a matter of law, he was qualified to do so.

The death certificates, which classify the deaths as homicides, were admitted into evidence. Griffin does not complain of their admission. If admission of Mitchell's testimony as to the manner of death was error for any reason, the error would be harmless because the testimony merely restated the contents of the death certificates. There was no deficiency in trial counsel's not objecting to Mitchell's testimony.

(h) Griffin complains that trial counsel failed to object to Jerry Hall's testimony on the ground that his probation order required him to testify consistently with his inquisition. The State argues that the issue was not raised in the district court, and Griffin does not deny it. As we previously stated, issues not raised in the district court will generally not be considered on appeal. This issue was raised in *State v. Dixon*. In *Dixon*, we held that it was error to allow Hall to testify; however, because Hall's testimony was basically duplicated by Rodney Hayes, it was not reversible error. For that reason counsel's failure to object did not prejudice Griffin.

(i) Griffin complains that trial counsel's motions were inadequate. He concedes that counsel filed 12 motions on his behalf but claims that the motions were short on law and argument and contrasts them with the presumably adequate motions filed on behalf of Dixon. That Dixon's presumably adequate motions did not provide him a means of avoiding conviction demonstrates that, if Griffin's counsel's motions were wanting, no prejudice has been shown as a consequence.

## 4. WAS THE EVIDENCE SUFFICIENT TO ESTABLISH THAT GRIFFIN COMMITTED FELONY MURDER?

When a defendant challenges the sufficiency of evidence, this court's standard of review is whether, after review of all the evidence, viewed in the light most favorable to the State, the appellate court is convinced that a rational jury could have found the defendant guilty beyond a reasonable doubt. *State v. Mays*, 277 Kan. 359, 377, 85 P.3d 1208 (2004).

K.S.A. 21-3401(b) provides: "Murder in the first degree is the killing of a human being committed . . . in the commission of,

attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." Burglary is an inherently dangerous felony. K.S.A. 2004 Supp. 21-3436(a)(9). Griffin contends that the victims' deaths did not occur in the commission of, attempt to commit, or flight from the second burglary of Alicia Shaw's apartment. See Issues 2(d) and 3(e) for abbreviated forms of the same discussion.

The court has held in numerous cases that in order to determine whether the killing occurred in the commission of the underlying felony so that the defendant is subject to the felony-murder rule, the factors of time, distance, and the causal relationship between the underlying felony and the killing are to be considered. See, e.g., *State v. Kaesontae*, 260 Kan. 386, Syl. ¶ 1, 920 P.2d 959 (1996). " 'Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony-murder rule is ordinarily a question of fact for the jury to decide.' [Citation omitted.]" 260 Kan. at 390.

In *State v. Jacques*, 270 Kan. 173, the defendant was convicted of felony murder, with possession of cocaine as the underlying felony crime. Jacques and his friend, Everitt, formed a plan to purchase drugs in which Jacques was to stay away from the house where Everitt was going to purchase the drugs. Contrary to the plan, Jacques went to the house. Everitt was angry that Jacques failed to follow the plan, and they began a fight in which Jacques stabbed Everitt to death. Jacques went back into the house and completed the purchase. Jacques questioned the sufficiency of the evidence, arguing that he could not be guilty of felony murder because he did not possess cocaine at the time he stabbed Everitt. The court found no merit in his argument:

"When applying the felony-murder rule . . . the felony and the victim's death do not need to occur simultaneously, nor does the felony need to occur *before* the death. . . .

"We hold that the death need not occur during or after the commission of the felony to support a conviction for felony murder. The question for the jury is whether the death is within the res gestae of the crime, regardless of the actual sequence of events. [Citations omitted.]" 270 Kan. at 189-90.

The court reviewed the facts in *Jacques* — Everitt and Jacques' plan to buy cocaine, the attempt by Everitt to do so, Jacques' stab-

bing of Everitt, and Jacques' subsequent purchase of cocaine — in a light most favorable to the prosecution. That review showed one continuous transaction so that a rational factfinder could have concluded that the stabbing was within the res gestae of the possession of cocaine. Thus a rational factfinder could have found Jacques guilty of felony murder beyond a reasonable doubt. 270 Kan. at 190-91.

In the present case, defendant presses the issue whether the length of time between the burglary and the deaths precludes a finding of one continuous transaction. Griffin states that he has been unable to find any Kansas felony-murder case in which so much time elapsed between the underlying felony and the death. The evidence shows that the elapsed time between the burglary and explosion was approximately 2½ to 2¾ hours. Tena Wright, who lived in the apartment next to Alicia's, testified that she was awakened "after 6:00, about 6:15, 6:30" by a loud bang from somebody dropping something heavy on Alicia's stairs. From this testimony and Griffin's admission that he and Dixon returned to Alicia's apartment after leaving Hayes and Hall at Donnie Wishon's residence, it reasonably could be inferred that defendant was in Alicia's apartment at approximately 6:15 or 6:30 a.m. It is established that the explosion occurred at approximately 9 a.m. The deaths resulted from the heat and fire gases that followed the explosion.

Time is only one of the factors to be considered in determining whether the deaths occurred in the commission of the underlying felony. The other two are distance and causal relationship. In this case, there is no significant distance between the underlying felony and the deaths. With regard to the causal relationship, the State contends that there was an unbroken chain of causation from the second burglary of the apartment to the fire that killed the victims. The evidence showed that Griffin and Dixon entered the apartment without authority, pushed over the stove causing the gas supply pipe to break, heard the escaping gas hissing, and fled. After they fled, the gas continued to escape into the apartment until an unknown source touched off the explosion and fire.

The State contends that the majority rule is that there is sufficient evidence of felony murder where there is no break in the

chain of events from the underlying felony to the killing. The State cites a number of cases from foreign jurisdictions. Those most relevant to the discussion are the following: *Matter of Anthony M.*, 63 N.Y.2d 270, 481 N.Y.S.2d 675, 471 N.E.2d 447 (1984), and *State v. Hokenson*, 96 Idaho 283, 527 P.2d 487 (1974).

In the New York case, the court prefaced its discussion as follows:

"In the two appeals before us, elderly victims of crime — an attempted purse-snatching, and a robbery and burglary — some days after these incidents succumbed to heart attacks, having shown no immediate signs of heart trouble. The central issue is whether there was sufficient proof to support the fact-finders' determinations that the stress of the incidents was a cause of the fatalities." 63 N.Y.2d at 275.

In the first case, defendant grabbed the handbag of an 83-year-old victim with enough force to throw her to the sidewalk. She was hospitalized with a fractured hip, underwent surgery, developed congestive heart failure, and died 10 days after the attack. In the second case, defendant robbed an 89-year-old man and his wife in their apartment, threatened them with a knife, struck him in the face, bound them, and left them lying face down on the floor. Later the same day, the man was taken to a hospital, treated for cuts and bruises, and released. Fifty-six to 57 hours after the robbery, he suffered heart failure and died. Both defendants contended that the causal connection between offense and heart failure was insufficiently established. Finding that each defendant's actions forged a link in the chain of causes that brought about the deaths of the victims despite the deaths not "follow[ing] on the heels" of the injuries inflicted by defendants, the New York Court of Appeals concluded that there was sufficient evidence of causation. 63 N.Y.2d at 280-81.

In the Idaho case, defendant convinced a pharmacist to meet him at the pharmacy after hours and then showed up wearing a gas mask and carrying a sack, which he said was a bomb. The pharmacist tackled defendant, got him in a headlock, and pushed the sack about 10 feet away. Two police officers arrived and handcuffed defendant. One officer went outside and moved the patrol car to the rear door of the pharmacy. When he returned, he was

told of the bomb threat. He went to the sack, picked it up, and was killed when the device exploded. Defendant contended that the evidence was insufficient to hold him criminally liable for felony murder. The Idaho court looked to opinions from other states' courts for the following principles of law: Homicide is committed in perpetration of the felony if the killing and the felony are parts of one continuous transaction, and liability will be imposed where the conduct causing the death was done in furtherance of the design to commit the felony. 96 Idaho at 288. Applying the law to the facts, the Idaho court concluded that there was sufficient evidence of causation:

"The explosion causing the death of Officer Flavel clearly falls within the above two definitions. A person is criminally liable for the natural and probable consequences of his unlawful acts as well as unlawful forces set in motion during the commission of an unlawful act. The appellant voluntarily set in motion an instrumentality which carried a very real probability of causing great bodily harm. Death ensued, and the fact appellant was under arrest does not erase criminal liability." 96 Idaho at 288.

Relying on *State v. Kunellis*, 276 Kan. 461, 78 P.3d 776 (2003), Griffin challenges the notion that the deaths and the underlying felony are parts of one continuous transaction. His reliance is misplaced. *Kunellis* must be restricted to its peculiar facts. There defendant and several others stole motorcycles from a dealership, drove against traffic on a multi-lane highway when pursued by police, and killed two people in a collision. Instead of prosecuting Kunellis for the deaths as felony murders that occurred in flight from the theft, the State pursued the theory that the theft was a continuing offense. As a matter of law, the theft was not a continuing offense. Thus, the State's arguments, the instructions, the verdict forms, and the verdict form's box marked by the jury incorrectly stated the law. 276 Kan. at 473. For this reason, the case was reversed and remanded for retrial on the felony-murder and theft charges. 276 Kan. at 474.

In the present case, the only one of the three factors about which there is any question is time. Distance is not an issue, and the causal relationship between the hissing gas heard by Griffin and the deaths was firmly established. The gas line was broken during per-

petration of the burglary, and the resulting explosion was part of the continuous transaction. Thus, viewing the evidence in the light most favorable to the prosecution, we conclude that a rational fact-finder could find beyond a reasonable doubt that Griffin was criminally liable for the deaths of Dana and Gabriel Hudson, which were consequences of the gas leak that was created during the commission of the burglary of Alicia Shaw's apartment.

## 5. WAS THE EVIDENCE SUFFICIENT TO ESTABLISH THAT GRIFFIN COMMITTED AGGRAVATED BATTERY?

Three neighbors were injured attempting to assist occupants of the burning apartment building. James Woodling and Nathan Medlen were injured trying to assist Tena Wright, and Rosalind Harris was injured trying to assist Stacey DePriest. Griffin contends that he cannot be held criminally liable for their injuries because the actions of rescuers were not reasonably foreseeable consequences of his actions. On the contrary, it is entirely reasonable and foreseeable that neighbors would attempt to rescue persons from a burning building and that rescuers could be injured while doing so. See *State v. Anderson*, 270 Kan. 68, 76-77, 12 P.3d 883 (2000) (speeding defendant charged with involuntary manslaughter when pursuing officer involved in collision that killed another motorist).

In the present case, it was reasonably foreseeable that the leaking gas would lead to an explosion and fire, that occupants of the burning building would try to escape, and that others would try to help them. Thus, Griffin should not be surprised that harm occurred in consequence of the burglary. After review of all the evidence, viewed in the light most favorable to the State, we conclude that a rational jury could have found the defendant guilty beyond a reasonable doubt of aggravated battery.

## 6. DID THE TRIAL COURT ERR IN REFUSING TO INSTRUCT THE JURY ON LESSER INCLUDED OFFENSES OF FELONY MURDER?

The general rule for giving lesser included offense instructions is not followed in the case of felony murder. In felony-murder

cases, the trial court is only required to instruct on a lesser included offense of felony murder when the evidence of the underlying felony is weak or inconclusive. The reason for this rule is that the killer's malignant purpose is established by proof of the collateral felony. *State v. Sandifer*, 270 Kan. 591, 597, 17 P.3d 921 (2001).

Griffin's trial counsel requested lesser offense instructions. The trial court declined on the ground that the evidence of the underlying felony was neither incomplete nor inconclusive.

On appeal, Griffin argues that the evidence of the burglary was weak and inconclusive because there was no showing that the value of the damage was more than $500 or that Griffin did anything to aid or abet Dixon.

The intent with which an entry is made is rarely susceptible of direct proof; it usually may be inferred from the surrounding facts and circumstances. *State v. Wilkins*, 269 Kan. 256, Syl. ¶ 4, 7 P.3d 252 (2000). In the absence of evidence of some other explanation for the second unlawful entry into the apartment in the same night, it reasonably may be inferred from Griffin's stealing property during the first entry of the apartment that when he reentered the apartment he intended to steal again. See discussion of Issue 2(a). Thus, the evidence of the underlying burglary is neither weak nor inconclusive. The trial court did not err in refusing to instruct the jury on lesser included offenses of felony murder.

## 7. WAS EVIDENCE THAT GRIFFIN ACCOMPANIED DIXON TO THE OFFICE OF DIXON'S ATTORNEY IMPROPERLY ADMITTED?

Griffin argues that the State should not have been allowed to elicit testimony that Griffin went to Dixon's lawyer's office along with Dixon and Hall. He contends that the jury was being asked to infer guilt from the evidence that he visited a criminal defense attorney. A timely and specific objection to the admission of evidence at trial must be made in order to preserve the issue for appeal. *State v. Flynn*, 274 Kan. 473, 496, 55 P.3d 324 (2002). There was no objection to the testimony Griffin complains of. Griffin notes that the issue was raised before trial and decided against him and that the issue was also decided against defendant in

Dixon's case. "The rationale underlying the contemporaneous objection rule is that stating the objection and grounds therefor permits the court to preclude improper evidence from affecting the decision." *State v. Gordon*, 219 Kan. 643, Syl. ¶ 9, 549 P.2d 886 (1976). Because, in the circumstances, the trial court was well aware of the issue and had several opportunities to rule on it, Griffin suggests that the issue ought to be considered in the interest of justice. In *State v. Wiegand*, 275 Kan. 841, 844, 69 P.3d 627 (2003), the court stated that an exception to the general rule may be made where "questions are raised for the first time on appeal if consideration of the same is necessary to serve the ends of justice or to prevent denial fundamental rights."

Here is Hall's testimony about Griffin's going to Dixon's lawyer's office:

> "Q. Did Wallace Dixon ever ask you to go anywhere particularly the next couple of days?
> "A. He asked me to go to his lawyer's office.
> "Q. Did you agree?
> "A. Yes, I did.
> "Q. How did you get there?
> "A. Wallace came and picked me up.
> "Q. And when you got to the lawyer's office, do you know who the lawyer was?
> "A. Yes, I do.
> "Q. Who was it?
> "A. Joe Johnson.
> "Q. When you got to the lawyer's office was anyone else there?
> "A. Well, on the way to the lawyer's office we drove by Ethan's because Wallace wanted to bring Ethan with us but Ethan followed us to the lawyer's office.
> "Q. Did all three of you go into the lawyer's office?
> "A. Yes, we did.
> "Q. You, Wallace Dixon, Ethan Griffin?
> "A. Yes, we did.
> "Q. Did you meet with this lawyer?
> "A. Yes, we did.
> "Q. Did Wallace in your presence and the defendant's presence begin telling the lawyer what had happened?
> "A. I believe Wallace said something about it because the lawyer chewed Wallace out about it. Ethan didn't say much about it. The lawyer asked us if we would be . . . ."

An objection was sustained, and the subject was changed.

The State's position is that the testimony is not objectionable because the evidence was introduced to establish a sequence of events rather than to suggest Griffin had a guilty mind. The State also notes that the testimony does not show that Griffin was seeking legal advice. The State's fallback position is that, even if erroneously admitted, the testimony was harmless because it was brief and innocuous. Errors that do not affirmatively cause prejudice to the substantial rights of the defendant do not require reversal when substantial justice has been done. *State v. Kendall*, 274 Kan. 1003, 1010, 58 P.3d 660 (2002).

The testimony at issue was brief. It showed that Johnson was Dixon's lawyer, that Griffin went to Johnson's office at Dixon's request, and that Griffin was peripheral to the discussion. The testimony is of questionable relevance, but there would seem to be little likelihood that the jury would have inferred defendant's guilt from evidence that Griffin went to Dixon's attorney's office at Dixon's request. We conclude that the admission of the evidence was harmless error.

Dixon also raised this issue in his appeal, and we concluded it was reversible error. However, there the circumstances were different and the evidence and comments by the prosecutor were substantial rather than brief. It was not peripheral but was directed at Dixon's seeking legal advice from his attorney. We said in *Dixon*:

"Viewing the prosecutor's conduct in light of the trial record as a whole, as required, we find that the prosecutor's eliciting testimony from multiple witnesses and then commenting on it in closing argument improperly highlighted defendant's conduct for the jury on five separate occasions. The prosecutor's repeated references to defendant's contacting counsel certainly appears to have been intended to imply that only guilty people contact their attorneys and to cause the jurors to infer guilt on that basis. In these circumstances, the prosecutor's conduct amounted to a flagrant violation of Dixon's right to a fair trial in that the conduct penalized him for exercising his right. The jury could have found, based on other evidence, that Dixon was guilty. The jurors, however, also might have decided Dixon was guilty because the prosecutor implied that defendant must be guilty by repeatedly eliciting testimony and commenting on defendant's contacting counsel. Under such circumstances we cannot conclude that such error was harmless." 279 Kan. at 592.

## 8. DID THE JURY INSTRUCTION ON FELONY MURDER INCORRECTLY INCLUDE DEFENDANT'S FLEEING FROM AN ATTEMPTED FELONY?

Griffin complains of the instructions on the alternatives for murder in the first degree. There was no objection to the instructions at trial. The court reviews instructions by a clearly erroneous standard where there was no objection to the instructions at trial. Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility that the jury would have rendered a different verdict if the error had not occurred. *State v. Davis*, 275 Kan. 107, 115, 61 P.3d 701 (2003).

The instructions at issue stated in part:

"In this case, the State has charged Mr. Griffin in Count 1 [and Count 2] with the offense of murder of Dana Hudson [and Gabriel Hudson] in the first degree and has introduced evidence on two alternate theories of proving this crime.

"The State may prove murder in the first degree by proving beyond a reasonable doubt that Mr. Griffin killed Dana Hudson [and Gabriel Hudson] and that such killing was done while in the commission of, attempting to commit, in flight from committing or attempting to commit aggravated arson or in the alternative by proving beyond a reasonable doubt that Mr. Griffin killed Dana Hudson [and Gabriel Hudson] and that such killing was done while in the commission of, attempting to commit, or in flight from committing <u>or attempting to commit burglary</u>, as set out in instruction number 26." (The complained-of phrase is underlined.)

On appeal, Griffin argues that because K.S.A. 21-3401(b) does not include flight from attempting to commit an inherently dangerous felony, the instruction is an incorrect statement of the law. The instruction may be flawed but not in the way Griffin points out. Where the instruction purported to present the alternative theories of first-degree murder, it actually repeated the felony-murder theory twice and omitted the premeditated-murder theory. The second quoted paragraph of the instruction should have followed the pattern instruction, which states:

"The State may prove murder in the first degree by proving beyond a reasonable doubt that the defendant killed _____ and that such killing was done while (in the commission of) (attempting to commit) (in flight from [committing] [attempting to commit]) _____ or in the alternative by proving beyond a reasonable doubt that the defendant killed _____ intentionally and with premeditation, as fully set out in these instructions." PIK Crim. 3d 56.02-A.

As can be seen in this excerpt from the pattern instruction, flight from attempting to commit an inherently dangerous felony is included. "The Pattern Instructions for Kansas were developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions, and while they are not required, they are strongly recommended for use by Kansas trial courts." *State v. Beck*, 32 Kan. App. 2d 784, 786, 88 P.3d 1233 (2004). Although it might have been better practice for the trial judge to have selected only the parenthetical phrases that fit the facts of this case, in which event the challenged phrase would not have been included in the jury instruction, the phrase is not a misstatement of the law.

### 9. WAS THE JURY PROPERLY INSTRUCTED WITH REGARD TO THE PREDICATE CRIMES FOR THE BURGLARY CHARGES?

With regard to the second burglary, the jury was instructed:

"To establish this charge, each of the following claims must be proved:
1. That Mr. Griffin knowingly entered or remained in a building which is a dwelling;
2. That Mr. Griffin did so without authority;
3. That Mr. Griffin did so with the intent to commit a theft, and/or aggravated arson, a felony, and/or criminal damage to property, a felony, therein; and
4. That this act occurred on or about the 29th day of July, 2001 in Lyon County, Kansas."

There was no objection to the instruction at trial. On appeal, Griffin contends that the jury should have been required to agree on one of the three intents—theft, aggravated arson, or criminal damage to property. He cites *State v. Hill*, 271 Kan. 929, 939, 26 P.3d 1267 (2001), for the proposition that, when multiple acts could form the basis of a criminal count, jury unanimity is required.

The State correctly states that this is an alternative means question rather than one of multiple acts. The distinction is well stated in the following excerpt from *State v. Timley*, 255 Kan. 286, 289-90, 875 P.2d 242 (1994):

"In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means.

[Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]

"In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt. [Citations omitted.]" 255 Kan. at 289-90 (quoting *State v. Kitchen*, 110 Wash. 2d 403, 410, 756 P.2d 105 [1988]).

Jury unanimity was not required. Griffin does not contend that there was not substantial evidence to support each of the alternative means.

10. WAS THE TRIAL COURT'S RESPONSE TO THE JURY'S QUESTION ABOUT INTENT REQUIRED FOR AGGRAVATED ARSON MISLEADING OR CONFUSING?

The trial judge's response to the jury's inquiry was neither misleading nor confusing. We note that if there was any confusion due to the trial court's response, it probably worked in defendant's favor. In addition, we need not consider this issue since Griffin was acquitted of the charge of aggravated arson.

Affirmed.

LUCKERT and GERNON, JJ., not participating.

RULON, C.J., and LARSON, S.J., assigned.