No. 73,322

STATE OF KANSAS, *Appellee*, v. LECK B. KAESONTAE, *Appellant.*
(920 P.2d 959)

Opinion filed July 12, 1996.

*Jean K. Gilles Phillips*, assistant appellate defender, argued the cause, and *Hazel Haupt*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the brief for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is a direct appeal by Leck Kaesontae from his conviction by the district court of one count of attempted aggravated robbery and one count of felony murder. The controlling term of his sentence is life imprisonment.

Kaesontae contends the district court erred in (1) finding that the killing was committed in an attempt to commit aggravated robbery; (2) admitting into evidence the tape recording of a 911 call made by a witness to the shooting; and (3) admitting into evidence the statement Kaesontae made to police.

The early morning hours of February 5, 1994, found five young men in two cars, with Matt Edgington alone in one car and Leck Kaesontae, David Edgington, Matt Journey, and Tim Blaine be-

hind him in Blaine's car. Blaine testified that Kaesontae had explained Matt Edgington's being by himself as follows: "So he can start shit so they think he's by himself and actually he wouldn't be because we'd be behind him." Shortly after 2 a.m. they saw a man walking by himself. Blaine stopped in a parking lot to let Matt Edgington catch up. Blaine testified that Kaesontae said he wanted "to jack" the walking man, which meant that he wanted to rob him. Blaine said he was not going to be a part of robbing him. Kaesontae got out of Blaine's car and got into the front passenger seat of Matt Edgington's car.

Within a few minutes of arriving there, Matt Edgington drove off, and Blaine followed him. Soon Blaine saw Matt Edgington's car stop by the walking man. At first Blaine held back, but at the urging of Journey he pulled to within 30 to 35 feet of the lead car. The front window on the passenger side of Matt Edgington's car was down, and the man walked over to the car. The man bent down and acted as if he were pointing directions for the young men in the lead car. Then Blaine saw Kaesontae point a gun toward the man.

The man threw his hands up in the air and backed toward the rear of the car. He continued moving away from the window until his back was against the rear end of the passenger side of the car. Then, keeping his back against the side of the car, the man walked toward the front of the car and swung his right arm into the window. From Blaine's car it looked like the man fell or was pulled into the car. The man's feet were on the ground, but his body from the chest up was inside the car. Blaine saw the gun in Kaesontae's hand, pointed toward the man's chest, and heard two shots fired.

The man grabbed at his chest and walked back from the car. Matt Edgington immediately drove away. When Blaine drove off, the man was still upright in the street, but stumbling.

Matt Edgington made a 911 call at approximately 2:30 a.m. In response, Officer Cross went to a convenience store near the scene of the shooting and met Matt Edgington. During the 911 call, Matt Edgington had reported that a passenger in his car shot at a pedestrian. He also reported that he had dropped the passenger off at his house before making the call. Officer Cross and Matt Ed-

gington first drove by Kaesontae's residence, and then Edgington was taken to the city building to be interviewed.

Before 3 a.m., police found the body of a man with a bullet wound below the rib cage lying in the yard of a residence. The man, Chance Pratt, died of a gunshot wound that resulted in massive internal bleeding. The bullet entered the right side of his chest, lacerated the front of the liver, perforated the heart and lower lobe of the left lung, and exited on the left side. The shot was fired at close range.

Timothy Blaine was the chief witness for the State at trial. The State indicated that Matt Edgington was available as a witness but was not called by the State or the defense.

We first consider Kaesontae's contention that the findings of the district court judge do not support the conviction of felony murder. The findings singled out by Kaesontae are contained in these comments made by the judge at the close of the evidence:

"Mr. Blaine saw the gun pointed, saw Mr. Chance Pratt raise his hands and back away and that after backing away he went towards the rear of the car, crouched and put his back to the rear quarter panel while Mr. Edgington and Mr. Kaesontae simply sat there in the car. Mr. Chance Pratt came forward, either reached in or hit into the car in a sudden manner, there was a scuffle, the gun went off.

. . . .

"[A]t the point at which Mr. Leck Kaesontae raised the gun and asked for the wallet this became an attempt at aggravated robbery. . . .

"The attempted aggravated robbery had stopped. That's not a legal term or a legal conclusion. it just had stopped. Mr. Kaesontae and Mr. Edgington were apparently simply sitting there in the car. What they were talking about or doing or thinking, we don't know. I suspect they may not know. We have no idea of what Chance Pratt was thinking. . . .

"It does not feel right to say that Mr. Kaesontae did a premeditated first-degree murder; however, the public policy on felony murder is that a person who commits a felony assumes all the risks of that action, whatever happens. It's clear to the Court that but for this felony for which Mr. Kaesontae bears responsibility, Chance Pratt would not have been killed on that night, and that the imperfect tool of felony murder is the box, the pigeon-hole which best fits this particular set of facts."

K.S.A. 21-3401(b) provides: "Murder in the first degree is the killing of a human being committed . . . in the commission of,

attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." Aggravated robbery is designated an inherently dangerous felony. K.S.A. 21-3436(a)(4).

Kaesontae argues that the district court found that the killing of Pratt was not committed in the attempt to commit or flight from the aggravated robbery of Pratt. The district court found that the attempt to commit aggravated robbery had "stopped." It further found that Kaesontae and Edgington "simply sat" in the car while Pratt backed away and then "went towards the rear of the car, crouched and put his back to the rear quarter panel." Then, "Pratt came forward, either reached in or hit into the car in a sudden manner, there was a scuffle, the gun went off." In Kaesontae's summation, before Pratt was shot he had "essentially escaped" and was not being pursued. Nor were Matt Edgington and Kaesontae fleeing or attempting to flee. Pratt opened a new episode by "reinsert[ing] himself into the situation."

The State's position is that a victim's resistance to an underlying felony may extend the duration of the criminal transaction beyond the time when the felony is technically complete. For the proposition, the State quotes *State v. Giddings*, 226 Kan. 110, 113, 595 P.2d 1115 (1979) (quoting *State v. Branch and Bussey*, 223 Kan. 381, 383, 573 P.2d 1041 [1978]):

" 'A felon's attempt to commit a robbery sets in motion a chain of events which should cause him to contemplate that a death might occur. This is particularly true of a robber who carries a deadly weapon (as these robbers did) and forces his way into an occupied dwelling. The impulse for an individual to resist the sudden show of force, to defend himself or to come to the aid of a family member or loved one, is a basic human instinct. Under such circumstances every robber who expects human opposition to his quest to steal, as he must when he commits a statutory robbery, is a potential assassin because he knows he may be forced to use his weapon either to carry out his criminal act or to escape without being pursued and captured by his victim.' "

The State contends that in applying this rationale to the circumstances of the present case, the conclusion that the killing and the attempted aggravated robbery were part of one continuous transaction is unavoidable.

The connection between the inherently dangerous felony and the killing has been the subject of other decisions of this court. In *State v. Rider, Edens & Lemons*, 229 Kan. 394, Syl. ¶ 4, 625 P.2d 425 (1981), the court stated:

"Time, distance, and the causal relationship between the underlying felony and the killing are factors to be considered in determining whether the killing is a part of the felony and, therefore, subject to the felony-murder rule. Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony-murder rule is ordinarily a question of fact for the jury to decide. (Following *State v. Hearron*, 228 Kan. 693, 619 P.2d 1157 [1980].)"

In *State v. Lashley*, 233 Kan. 620, 631, 664 P.2d 1358 (1983), we said:

"[The victim's] property stolen in Arkansas was brought into Wilson County, Kansas. Time, distance, and the causal relationship between the underlying felony and killing are factors to be considered in determining whether the killing is a part of the felony and therefore subject to the felony murder rule. Whether the underlying felony had been abandoned or completed prior to the killing so as to remove it from the ambit of the felony murder rule is ordinarily a question of fact for the jury to decide. [Citation omitted.] When the evidence is conclusive, as a matter of law, and the murder occurred within the res gestae of the crime, the trial court need not instruct that determination of whether the murder occurred within the res gestae is a fact question for the jury. [Citation omitted.]"

Here, the district court judge was the trier of fact, and he found that the attempted aggravated robbery had "stopped" before the killing. He also found that Matt Edgington and Kaesontae were "simply sitting there in the car," which Kaesontae equates with a finding that they were not fleeing from the scene of the felony. The only conclusion which can be drawn from these findings, according to Kaesontae, is that the attempted aggravated robbery had been completed prior to the killing so as to remove it from the scope of the felony-murder rule.

We do not agree. Kaesontae's contention ignores the circumstances as they would have been perceived by the victim of the robbery attempt. Pratt was alone and on foot in the early morning hours. A young man in the car ahead of him had tried to rob him at gunpoint, and behind him was a car occupied by three young men who seemed to be affiliated with the would-be robber and

the driver of the lead car. A reasonable person in these circumstances would not have assumed that the danger had passed. Thus, it can be said that the chain of events set in motion by Kaesontae when he attempted to rob Pratt continued after Kaesontae "stopped" trying to take the victim's money.

Although the district court judge stated that the attempted aggravated robbery "just had stopped," he went on to conclude that "a person who commits a felony assumes all the risk of that action, whatever happens" and "but for this felony Pratt would not have been killed." The trial judge concluded that the facts fit into a "box, the pigeon-hole" of felony murder. A causal connection existed between Pratt's death and Kaesontae's attempt to rob him. This is true whether expressed in the terms used by the district judge in the present case or in terms that the death was the proximate cause of, the direct or indirect result of, or a continuous part of the criminal conduct of Kaesontae.

Applying the factors of time, distance, and the causal relationship between the attempted aggravated robbery and Pratt's death, we have no hesitancy in concluding that the killing of Pratt was a part of the attempted aggravated robbery and subject to the felony-murder rule. We further hold that the findings of the district court support the conviction of the defendant of felony murder.

We next consider if the trial court erred in admitting into evidence the tape recording of a 911 call made by Matt Edgington. He did not testify at Kaesontae's trial. A tape recording of the call and a transcript made from the tape were admitted into evidence under the business records exception to the hearsay rule. The following exchange preceded playing of the tape:

"MR. KAUFMAN: Your Honor, I move for the admission of State's Exhibit No. 37, the 911 tape.

"THE COURT: Mr. Pullman, 37?

"MR. PULLMAN: If the basis is only the business records exception to hearsay, Your Honor, I would have no objection.

"MR. KAUFMAN: That would be the basis for my moving it.

"MR. PULLMAN: Then I would have no objection to that basis, Your Honor.

"THE COURT: Very well. 37 will be admitted."

On appeal, Kaesontae contends that his right to confront witnesses against him was violated by introduction of the tape. Be-

cause the constitutional issue was not raised below, it is not properly before this court. *State v. Steadman*, 253 Kan. 297, 306, 855 P.2d 919 (1993). Failure to object also waives a challenge on appeal to admission of the evidence. *Noel v. Pizza Management, Inc.*, 258 Kan. 3, 9, 899 P.2d 1013 (1995).

In his fallback position, Kaesontae asks the court to overlook the failure to object "in light of fundamental fairness." This court has exercised its power to hear new issues where necessary to serve the interest of justice or prevent denial of fundamental rights. *State v. McCloud*, 257 Kan. 1, 10, 891 P.2d 324 (1995). Kaesontae does not raise such an issue. Entertaining the issue would be a futile exercise. The well-established rule in this state is that sound recordings made and kept in the ordinary course of business by public authorities are not excludable on hearsay grounds. See K.S.A. 60-460(m); *State v. Rainey*, 233 Kan. 13, 16-17, 660 P.2d 544 (1983).

Kaesontae also makes the argument that the evidence was insufficient to sustain his conviction of felony murder based upon his contention that the 911 call was inadmissible. His theory is that his felony-murder conviction cannot stand because the State's case did not include the corpus delicti, proof of an attempt to rob Pratt. According to Kaesontae, "[t]he only evidence that any demand was made for property" was the tape recording of Matt Edgington's 911 call. Because the tape "should not have been admitted," proof of the robbery attempt fails. Without proof of the underlying felony of attempted aggravated robbery, the argument continues, the body (corpus) or substance of the crime (delicti) of felony murder cannot have been proved. The argument fails because the 911 tape was properly admitted.

Finally, Kaesontae argues that the trial court erred in admitting into evidence his statement to the police. Over the objection of defense counsel, tape recordings of Kaesontae's statements made during an interview conducted by police on Saturday morning, February 5, 1994, were admitted into evidence. Kaesontae's pretrial motion to suppress this evidence was denied by the district court on the following grounds:

"The defense would be if they tried to overbear this man's will or somehow mislead him into doing it. I don't see any evidence whatever of that. The time periods here the Court sees the paperwork it takes to get people processed through the system and a half hour here and there is easily lost. I don't think this time period is time enough that time itself is—was used as a weapon against him.

"The police did pay attention to Miranda, they Mirandized him orally and in writing, they referred back to Miranda, they left off, gave him another chance to think about it. As soon as he talked about getting a lawyer they didn't just start talking to him again as soon as he was ambivalent, they tried to clarify to him that a lawyer could be available, they didn't tell him he'd have to wait a long time for one."

The district court also ruled out the possibility that Kaesontae's alcohol consumption affected his decision to talk with police. In the words of the district court judge, "We're talking about over eight hours before."

This court's review of the trial court's decision to admit the evidence is somewhat limited, although this court's standard of review is well settled. *State v. Garcia*, 250 Kan. 310, Syl. ¶¶ 2, 3, 827 P.2d 727 (1992), states:

"If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence this court on review will not substitute its view of the evidence for that of the trial court."

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion."

In this case, the evidence presented by the State at the hearing on the motion to suppress showed that Kaesontae was awakened at his house at approximately 6 a.m., arrested, read his rights from a plastic *Miranda* card, and taken to an interview room at the city building. Handcuffed to the table, Kaesontae reviewed, read aloud, and signed a written *Miranda* form at 6:55 a.m. Kaesontae asked about a lawyer, and one of the detectives advised him "that if he could not afford a lawyer the Court would appoint a lawyer to him at any time he wanted one." Kaesontae told the detective that he wanted to talk to him "about what occurred." They talked until 7:25 a.m. At 7:30 the detective asked Kaesontae if he wanted

anything to drink and then gave him a soft drink as requested. It was not until 9:17 that there was additional contact between Kaesontae and police officers. At that time Kaesontae told the detectives, Relph and Chisholm, "that he wanted to talk to his lawyer first." The detectives left the interview room at 9:24. At approximately 9:43 Detective Chisholm, following standard procedure, opened the door and looked in on Kaesontae and immediately left again. As he "was walking back past the interview room" a few minutes later, Detective Chisholm heard Kaesontae asking for a detective to come to his room. Chisholm opened the door and asked Kaesontae what he wanted. According to Chisholm, "He told me that it was driving him crazy, that he wanted to talk to us about the incident, about what had happened." Chisholm responded by

"explain[ing] to him that he had invoked his right, he'd asked for a lawyer, that we wouldn't—that we weren't allowed to talk to him because of that unless he had—unless he wanted to talk to us. I asked him if he wanted to talk to us without his lawyer being present."

Chisholm testified that Kaesontae told him, "[Y]es, he did, that it was driving him crazy." Chisholm told Kaesontae that "we'd be back with him in a couple minutes." The tape recording which was admitted into evidence was made when Detectives Relph and Chisholm talked to Kaesontae between 10:20 a.m. and 12:20 p.m. This evidence was uncontroverted.

Kaesontae cites *State v. Johnson*, 253 Kan. 75, 853 P.2d 34 (1993). There, the court stated: "The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused." 253 Kan. at 83-84. The court further stated the "totality of the circumstances" is to be considered, including "the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation." 253 Kan. at 83.

Kaesontae complains, not about the duration of the interrogation, but rather about the length of time he was kept in the interrogation room. In this regard, he suggests that "the officers were

playing a waiting game" with him. He intimates that his youth, foreign birth, and hangover contributed to his being adversely affected by being left alone in the interrogation room. The district court, however, found that the police were not using time as a pressure tactic, and there is substantial evidence to support that finding. The district court also discounted any effect from alcohol consumption the previous night. The complete absence of any evidence indicating that Kaesontae's behavior was affected by his earlier consuming alcohol supports the district court's determination. Concerning his ability upon request to communicate with the outside world, Kaesontae first contends that there is no evidence that he was permitted to speak with his family or others. Nor, however, is there any indication which has been brought to the court's attention that he requested to do so. Second, he contends that "[t]here is no indication that [he] was offered the opportunity to have counsel any sooner than Monday." [Kaesontae was interrogated on a Saturday morning.] Nor is there any indication that Kaesontae asked to have counsel made available to him sooner than that. He states that the witnesses were not able to rule out the possibility that one of the detectives may have stated that appointment of counsel would have to wait until Monday. This falls short of evidence that he requested an opportunity to communicate with an attorney, and his request was denied. Hence, review of the record shows that there was substantial competent evidence to support the trial court's decision.

Affirmed.