NOT DESIGNATED FOR PUBLICATION

No. 114,675

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DARRELL BROXTON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed November 9, 2017. Affirmed in part, sentence vacated, and remanded with directions.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Jose V. Guerra*, assistant district attorney, *Mark A. Dupree, Sr.*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., ATCHESON and SCHROEDER, JJ.

PER CURIAM: Convicted of second-degree murder, burglary, and felony theft, Darrell Broxton asks us to reverse his convictions based on the court's failure to instruct his jury on felony murder and not admitting evidence concerning a Florida homicide investigation. Additionally, he claims two sentencing errors—both dealing with the improper scoring of his prior convictions. We see no reason to reverse his convictions. Because the court improperly scored Broxton's attempted burglary conviction, a point the State concedes, we vacate his sentence and remand for resentencing.

1

*The investigation began after the discovery of a corpse.*

Peter Belmont, a resident of Wyandotte County, habitually picked up young African-American men in Kansas City, Missouri. Belmont had befriended several men this way. They would do odd jobs and yard work at his home. They would help him with his dogs. Three men became long-term friends: Michael Griffin, Raymond Miller, and Quincy Coleman. Some men Belmont would pick up and take back to his home, and then pay them for sex. Belmont's friends had warned him to stop picking up men he did not know because it was dangerous. The danger was real.

Belmont was killed in the bedroom of his home in December 2012. He had been struck repeatedly on his head with a sharp heavy object like a hatchet. His skull was cracked open, and he had defensive injuries to his hands and arms. One of his fingers was nearly amputated. There were blood spatter stains across the walls, ceiling, floor, bedsheets, and other items in the bedroom where his body was found. The clotted blood on the wall indicated that he had been struck over a period of time. Authorities estimated he had been dead for one to eight days.

There were no signs of forced entry into Belmont's home. But several items were missing, including two TVs and a Sony stereo system. Belmont's silver 2007 Honda Odyssey van was also missing.

Physical evidence found in Belmont's home proved to be important. Next to Belmont's safe, which was bolted to a cabinet, the detectives found a hammer and a couple of screwdrivers on the floor. Someone had tampered with the safe. On the living room floor, detectives found an orange juice bottle. Several bleach bottles were found in the home. On the dinette table, they found a calendar opened to December 2012. Appointments had been written on the calendar. For December 5, the words, "Darrell over" were written.

2

The last contact Belmont's friends had with him was on December 10, 2012. According to the phone records on two cellphones that were missing from Belmont's home, between December 10 and December 18, there were phone calls from Belmont's phones to James Hunter, Charles Lee, and Mr. Mission. In total, there were 11 calls from Belmont's phone to Hunter's phone on December 12. Obviously, dead men do not make phone calls.

Police found Belmont's van in January 2013 with four people inside; one was Clifford Harris. Harris told detectives that he got the van from two men in exchange for drugs. Harris did not know the men's names, but looked at photos and identified Hunter as the passenger of the van and later identified Broxton as the driver.

After speaking to Harris and finding Hunter's phone number in Belmont's phone records, detectives interviewed Hunter. Hunter led the officers to Broxton. Hunter told the officers that Broxton had picked him up in a silver van around December 12, 2012, so the two of them could get high. When he got in the van, Hunter saw a lot of items in the back of the van including two flat screen TVs and a stereo. Broxton wanted Hunter to help him sell a TV. They sold a TV to buy drugs and carried the other items into Broxton's apartment. Then they called the "dope man" and bought drugs with the money. Hunter identified Harris as the dope man. They traded the second TV for more crack cocaine at a gas station. Later Hunter traded the van to Harris for "a nice little size piece of crack."

Detectives went to Broxton's apartment, were permitted inside, and immediately noticed the stereo system. Broxton told police he knew Belmont. Belmont would pick him up and they would have oral sex in Belmont's van, but he had never been to Belmont's house, nor did he know where Belmont lived. Phone records confirmed that Belmont and Broxton talked frequently. There were approximately 200 calls between Belmont's phone and Broxton's mother's and sister's phone numbers between November 1

3

and December 5. But there were no calls after December 5. Broxton told a detective he did not have a cell phone and used his mother's phone to contact Belmont.

Detectives searched Broxton's apartment and found Sony stereo equipment, cologne, a NYU sweatshirt, and a red souvenir pen with the word "Amsterdam" inscribed on it. The detectives believed all of these items were connected to Belmont. Coleman later identified these items as Belmont's. Belmont had attended NYU, had traveled to Amsterdam, and had kept a red pen hanging from the mirror in his van.

Also in Broxton's apartment, the detectives found a piece of paper with several phone numbers written on it. Part of Belmont's phone number was written on the paper with the name "Tim" under it. Belmont's friends called him Tim. There were also phone numbers written down for "C. Lee" and "Mission," which matched the numbers on Belmont's phone records. There were 19 calls between Belmont's phone and Mission after December 10, 2012, but none before that date. Broxton told a detective that Mission was his drug dealer. Lee was Broxton's acquaintance who talked to Broxton about doing handy work for him. Broxton said he had a sexual relationship with Lee.

DNA evidence implicated Broxton. Several items found in Belmont's home and Broxton's apartment were tested by the KBI for DNA. The DNA sample on the orange juice bottle found in Belmont's home was a match to Broxton's DNA. According to the evidence, the frequency of selecting an unrelated individual in the general population for the DNA profile on the orange juice bottle for the African-American population is one in 178 sextillion and, for the Caucasian population is one in 641 sextillion. The DNA on the bleach bottle found in Belmont's kitchen was consistent with the mixed DNA profiles of Broxton, Belmont, and two other individuals. But that mixed DNA profile was a very common DNA profile. The screwdriver found next to Belmont's safe had DNA on it from three individuals. Broxton's DNA was consistent with the DNA of one of the contributors found on the screwdriver. There was a mixture of DNA from at least two individuals

4

found on the collar of the NYU sweatshirt found at Broxton's apartment. The mixture was consistent with the DNA profiles of Broxton and Belmont. There was a mixture of DNA from at least two individuals on a dress shirt that was tested, and it was consistent with the mixed DNA profiles of Broxton and Belmont.

In addition to the DNA matches, the identification numbers on the stereo equipment found in Broxton's apartment matched the numbers for the stereo equipment missing from Belmont's home.

*The State produced additional evidence at trial.*

The State charged Broxton with first-degree premeditated murder for the death of Belmont; burglary of Belmont's 2007 Honda van; theft of the van; and theft of Belmont's electronic equipment, clothing, and a pen. All of the evidence mentioned above was heard by the jury.

In addition, the State introduced evidence that Broxton had been a suspect in a 1996 homicide in Florida. The facts were similar to Belmont's murder:

- The victim of the Florida murder was an older homosexual man;
- the victim had homosexual men frequent his home who were typically indigent drug users;
- there were no signs of forced entry;
- the victim had been struck forcefully and repeatedly on the head with a hammer;
- there was blood spatter on the walls and ceiling;
- a TV and VCR were stolen from the victim's home;
- the victim's vehicle was taken; and

5

- a water glass was left at the scene.

In 1998, Broxton gave a recorded statement to the Florida detectives, which was played for this jury. Broxton admitted to knowing, but denied killing, the Florida victim. Broxton admitted to being at the victim's home during the murder but implicated someone else in the homicide.

Broxton objected to the admission of any evidence of the Florida homicide. But the court admitted the evidence under K.S.A. 60-455. Broxton sought to elicit testimony from the detective that he was never charged nor convicted in the Florida homicide. Broxton also sought to introduce into evidence the "announcement of no information" filed by the Florida prosecutor, explaining the prosecutor's decision not to file charges. The trial court denied both requests, ruling that such evidence was not relevant.

At the jury instruction conference, Broxton requested a jury instruction for felony murder. The trial court denied the request.

The jury convicted Broxton of the lesser included offense of second-degree intentional murder, burglary, and both thefts. The court imposed consecutive prison sentences of 653 months for murder, 7 months for burglary, and 7 months for felony theft.

*The trial court improperly scored Broxton's attempted burglary conviction.*

Broxton contends that his 1990 Kansas attempted burglary conviction should have been scored as a nonperson felony under *State v. Dickey*, 301 Kan. 1018, 350 P.3d 1054 (2015). We agree. The State, in fact, concedes this point. Broxton's 1990 Kansas attempted burglary conviction on line 29 of the amended presentencing investigation report should be rescored as a nonperson felony. The sentencing court decided Broxton's

6

criminal history was A based on the mistake that he had three person felony convictions. Because he only had two, his criminal history score was B. See K.S.A. 2012 Supp. 21-6804. Because of this error, we vacate his sentence and remand for resentencing.

*The trial court did not err by refusing to give a felony-murder instruction.*

Contending there is a reasonable probability that the jury would have found him guilty of felony murder before it ever considered the charge of second-degree murder, Broxton asserts that a jury instruction on felony murder was both legally and factually appropriate. He suggests that in this instance, he would have received a hard-20 sentence for felony murder rather than the almost 53-year sentence he received for second-degree murder.

When analyzing jury instruction issues, an appellate court follows a three-step process:

- Determine whether we have jurisdiction or if there is a failure to preserve the issue for appeal;
- consider the merits to determine whether error occurred; and
- assess whether the error requires reversal, or is harmless. *State v. Pfannenstiel*, 302 Kan. 747, 752, 357 P.3d 877 (2015).

If the issue is preserved, we must consider whether the instruction was legally and factually appropriate. *State v. Louis*, 305 Kan. 453, 457-58, 384 P.3d 1 (2016). An instruction is factually appropriate if there is sufficient evidence for a rational fact-finder to find for the defendant on that theory. If the defendant requests an instruction at trial, the court must view the evidence in the light most favorable to the defendant. *State v. Dupree*, 304 Kan. 377, 397, 373 P.3d 811 (2016). If the district court erred, and the error did not violate a constitutional right, the error is reversible only if the court determines

7

that there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record. *Louis*, 305 Kan. at 457-58.

Since Broxton asked the trial court to give an instruction on felony murder because the jury could view the evidence as a death occurring during a robbery, he preserved the issue for appeal. The court denied the request because felony murder is not a lesser included offense of premeditated first-degree murder and there was no evidence of felony murder.

Caselaw indicates that there was no legal impediment to the trial court giving a felony-murder instruction here. Broxton acknowledges that felony murder is not a lesser included crime of first-degree premeditated murder. He argues, however, that a trial court may instruct on felony murder when a defendant has been charged with first-degree premeditated murder, relying on *State v. Young*, 277 Kan. 588, 87 P.3d 308 (2004). The State argues the instruction was not legally appropriate because felony murder is not a lesser included crime.

The trial court was correct. Clearly, felony murder is not a lesser included offense of first-degree premeditated murder. *State v. Stewart*, 306 Kan. 237, 247, 393 P.3d 1031 (2017). The statute, K.S.A. 2012 Supp. 21-5402, defines murder in the first-degree as the killing of a human being intentionally and with premeditation or in the commission of, or attempt to commit, or flight from, an inherently dangerous felony. Premeditated and felony murder are not separate and distinct offenses, but rather they are two theories under which the crime of first-degree murder may be committed. *State v. Thomas*, 302 Kan. 440, Syl. ¶ 1, 353 P.3d 1134 (2015). In other words, they are two different ways to commit murder. But our inquiry does not end there.

Our Supreme Court has held that a trial court *may* instruct the jury on felony murder even though the State only charged the defendant with premeditated first-degree

8

murder. "The fact that felony murder is not charged in an information does not preclude an instruction when evidence supports the instruction and the defendant is not unfairly surprised by the prosecution's reliance on that theory." *Young*, 277 Kan. 588, Syl. ¶ 4; see *State v. Wade*, 284 Kan. 527, 538-42, 161 P.3d 704 (2007). In *Young*, the trial court, without any request, instructed the jury on felony murder even though the defendant was charged only with premeditated first-degree murder. The Supreme Court held that this was not wrong. The *Young* court specifically acknowledged that felony murder was not a lesser included offense, but held that the trial court could instruct the jury on felony murder. 277 Kan. at 593, 595-97. This is the case Broxton relies upon.

It is important to note that it is the trial judge's responsibility to instruct the jury on the elements of the crime. The prosecutor cannot functionally elect to proceed on one theory of first-degree murder in its closing argument and thereby attempt to foreclose the jury's consideration of the other theory if the court has instructed the jury on that theory. *Thomas*, 302 Kan. at 449-51.

Because felony murder is not a lesser included offense, the trial court did not have a statutory *duty* to instruct the jury on felony murder under K.S.A. 2012 Supp. 22-3414(3). In *State v. Jackson*, 280 Kan. 16, 30-31, 118 P.3d 1238 (2005), the court rejected Jackson's claim that the trial court should have instructed the jury on felony murder as a lesser included offense to first-degree premeditated murder because the court found that felony murder was not a lesser included offense of first-degree premeditated murder.

To sum up, felony murder is not a lesser included crime of premeditated first-degree murder, but a jury may be so instructed if the facts call for giving the instruction. We now explore whether the facts called for the instruction here.

9

Broxton begins his analysis of this issue by asserting that "the facts of this case, that a man was killed *during* a robbery describe a classic felony murder scenario." (Emphasis added.) We recognize that assertion is not supported in the record on appeal. In his view, the underlying felony was aggravated robbery. This is legally significant because in a felony-murder prosecution, the felony stands in for the deliberation and intent required in a premeditated murder case. *Young*, 277 Kan. at 594. The policy behind the felony-murder doctrine is to deter those engaged in dangerous felonies from killing negligently or accidentally. *State v. Beach*, 275 Kan. 603, 626, 67 P.3d 121 (2003).

When confronted with the request to give the felony-murder instruction, the trial court declined. Broxton's trial counsel said:

> "I know it was not charged that way, Judge, but there is certainly evidence that there was property taken. A jury can consider this to be a robbery and a death occurring during a robbery, which would take—in effect, satisfy the requirements to find felony murder as opposed to premeditated first degree murder—first degree felony murder. So that's why I've listed that as a proposed instruction as well, Your Honor."

In response, the court opined:

> "[I]t's not a lesser included of first degree premeditated through case law and arguments in that fashion. And I can appreciate your argument, but there's just no evidence to support that argument. Now, there's supposition from here to glory, but, unfortunately, there's no evidence of that. Therefore, I'm not gonna give felony murder. I don't think it's appropriate under these circumstances."

When making this determination, whether the killing occurs *during* the commission of the dangerous felony, courts consider the time, distance, and causal relationship between the felony and the killing. *State v. Kaesontae*, 260 Kan. 386, Syl. ¶ 1, 920 P.2d 959 (1996).

10

"In light of the three discrete temporal options listed in the statute, the question for the jury is whether the death is within the res gestae of the crime, regardless of the actual sequence of events. With respect to felony murder, the res gestae includes those acts done before, during, or after the happening of the principal occurrence when those acts are so closely connected with the principal occurrence as to form a part of the occurrence." *State v. Dupree*, 304 Kan. 377, Syl. ¶ 4, 373 P.3d 811 (2016).

Aggravated robbery is "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person" when the defendant was "armed with a dangerous weapon" or "inflicts bodily harm upon any person in the course of such robbery." K.S.A. 2012 Supp. 21-5420.

Our Supreme Court has stated:

"'A felon's attempt to commit a robbery sets in motion a chain of events which should cause him to contemplate that a death might occur. This is particularly true of a robber who carries a deadly weapon (as these robbers did) and forces his way into an occupied dwelling. The impulse for an individual to resist the sudden show of force, to defend himself or to come to the aid of a family member or loved one, is a basic human instinct. Under such circumstances every robber who expects human opposition to his quest to steal, as he must when he commits a statutory robbery, is a potential assassin because he knows he may be forced to use his weapon either to carry out his criminal act or to escape without being pursued and captured by his victim.'" *Kaesontae*, 260 Kan. at 389.

Based on this record, we cannot conclude that the court erred when it declined to give the proposed instruction.

The circumstantial evidence revealed that this was not a case where someone was shot during the commission of a felony. This was an intentional bloody murder. The crime scene was a bloody mess. Belmont was hit repeatedly with a heavy sharp object over a period of time. His skull was cracked open. There was blood spatter on the walls,

11

ceiling, and bed. In essence, the trial court's interpretation of events was that Broxton killed Belmont and then went to work gathering up Belmont's things and attempting to open his safe. Based on our reading of the record, this is a reasonable interpretation.

The record consists of circumstantial evidence. There were no witnesses inside Broxton's bedroom. Premeditation, intent, and motive were all based on inferences from the physical evidence. Broxton did have a crack habit and sold Belmont's TVs to buy drugs. The time of the killing and the taking of the property must have been close. Belmont was killed sometime between December 10 and 12. The 10th was the last day Belmont had any contact with his friends. He must have been killed at least four days before he was found on the 16th because his decomposing corpse was stinking. Broxton picked up Hunter with the van sometime between December 10 and 13. Hunter was discharged from the detox center on December 10 and readmitted on December 13. So Belmont must have been killed around that time.

The trial court had no duty to instruct on felony murder because the charge was first-degree premeditated murder, and felony murder is not a lesser included crime. The State did not pursue felony murder as an alternative means to commit the crime, which was its prerogative. Under the theory set out in *Young*, the court could have instructed on its own motion but did not do so, obviously, because it held there was no evidence calling for it. Given the evidence in this record, we cannot hold the court erred when it ruled as it did. Basically, this record shows a man was brutally killed and some of his property was taken. There is no evidence that indicates the killing took place during the robbery. If there is no evidence, then it is speculation to say that the killing was part of the res gestae of the robbery. If the killing was not part of the res gestae, then this killing cannot legally be a felony murder. We find no error here.

*Excluding evidence of the Florida prosecutor's opinion is not reversible error.*

The trial court admitted evidence that Broxton had been a suspect in a 1996 homicide in Florida. The State offered the evidence to show identity under K.S.A. 2014 Supp. 60-455. The method of committing the Florida murder was so similar to the method utilized in this case that it is reasonable to conclude that the same person committed both murders. Broxton sought to introduce evidence that he had not been charged or convicted in that homicide. He sought to introduce the announcement of no information filed by the Florida prosecutor. The announcement of no information stated:

> "Comes now the State of Florida, by and through its undersigned Assistant State Attorney, and announces that it will file no information in the above entitled cause based on the following grounds:
>
> "ALTHOUGH PROBABLE CAUSE EXISTED WHICH JUSTIFIED THE ISSUANCE OF THE CIRCUIT JUDGE'S WARRANT, THERE IS INSUFFICIENT EVIDENCE AT THIS TIME TO PROCEED WITH PROSECUTION BECAUSE THE EXCULPATORY STATEMENT MADE BY THE DEFENDANT AFTER THE WARRANT WAS ISSUED CANNOT BE DISPROVED."

In Florida, prosecutors have a certain amount of time after the issuance of an arrest warrant to decide whether to file an information actually charging the suspect. Broxton argued such evidence was relevant for the jury to determine how much weight to give the State's evidence.

The trial court found that evidence that Broxton had not been charged in the homicide was not relevant. The trial court excluded the announcement of no information because under K.S.A. 2014 Supp. 60-455, the State does not have to show proof beyond a reasonable doubt that the defendant committed the prior act—rather, the State has to

13

show that the crimes are similar enough to show the same person committed the two crimes.

The court gave a limiting instruction: "Evidence has been admitted tending to prove that the defendant committed crimes other than the present crime charged. This evidence may be considered solely for the purpose of proving the defendant's identity."

Broxton acknowledges that a conviction is not required for prior bad acts evidence to be admitted under K.S.A. 2014 Supp. 60-455. But he argues that the evidence he wanted admitted was relevant to the weight the jurors should have given the properly admitted evidence. The State argues the announcement of no information that Broxton sought to introduce into evidence was not relevant because it reflected the opinion and discretion of the prosecutor not to charge Broxton. The State argues only a conviction or an acquittal has probative value.

Generally, evidence that a person committed a crime on a specified occasion is inadmissible to prove the person's disposition to commit a crime. K.S.A. 2014 Supp. 60-455(a). But such evidence is admissible when relevant to prove some other material fact such as identity. K.S.A. 2014 Supp. 60-455(b). Evidence that a person committed a crime on a specified occasion is admissible

> "to show the modus operandi or general method used by a defendant to perpetrate similar but totally unrelated crimes when the method of committing the prior acts is so similar to that utilized in the current case before the court that it is reasonable to conclude the same individual committed both acts." K.S.A. 2014 Supp. 60-455(c).

When prior crimes are introduced to show identity, the evidence should disclose sufficient facts and circumstances of the other offense to raise a reasonable inference that

14

the defendant committed both of the offenses. The evidence need not be identical, only similar. *State v. Richard*, 300 Kan. 715, 724, 333 P.3d 179 (2014).

The State cites *State v. Bly*, 215 Kan. 168, 177, 523 P.2d 397 (1974), *overruled on other grounds by State v. Mims*, 220 Kan. 726, 730, 556 P.2d 387 (1976). In *Bly*, in a prosecution for aggravated robbery of a supermarket, the State offered evidence of a record of conviction which showed that Bly had been convicted of bank robbery. The trial court admitted the evidence on the issue of identity. It was undisputed that Bly committed the prior bank robbery. Our Supreme Court held that the record of conviction alone did not show sufficient underlying facts, circumstances, or the means by which the bank robbery was accomplished to raise a reasonable inference that the same person committed both offenses. 215 Kan. at 178.

But this case is not like *Bly*. There is no dispute that the State admitted sufficient evidence of the Florida homicide to raise a reasonable inference that the same person murdered Belmont. Unlike *Bly*, Broxton attempted to admit the statement of no information in response to the State's evidence.

Even though *Bly* is not comparable to this case, the answer to the parties' dispute is found in *Bly*. The court stated that a basic principle governing K.S.A. 60-455 evidence is that:

> "To be admissible under 60-455 it is not necessary for the state to show that the defendant was actually convicted of the other offense. The statute specifically includes other crimes or civil wrongs. In fact an acquittal of the defendant of a prior offense does not bar evidence thereof where otherwise admissible. *The acquittal bears only upon the weight to be given such evidence.*" (Emphasis added.) 215 Kan. at 177.

Citing *State v. Darling*, 197 Kan. 471, 419 P.2d 836 (1996), the court stated that the fact the defendant was acquitted of the similar offense, otherwise admissible, does not affect

15

the admissibility of the evidence, but goes to its weight. Similarly, evidence that Broxton was never charged of the Florida homicide because Broxton's statement to police could not be disproved, goes to the weight of the Florida homicide evidence.

The statement of no information was relevant because it had a bearing on the weight the jury should give to the Florida evidence. It goes to the material issue in contention—identity. For the evidence to show identity, the defendant must have committed both offenses. There is no dispute that the facts and circumstances of both murders show that they were committed by the same person. Thus, evidence that Broxton did not commit one of the murders is evidence he did not commit either of the murders. Broxton denied that he was the perpetrator of either offense. That Broxton was never charged because of insufficient evidence is not dispositive but certainly relevant.

However, the error was harmless. The jury heard Broxton's 30-minute interview with detectives in which he denied committing the Florida homicide. The jury was never told that Broxton had been convicted of the Florida homicide. According to the statement of no information, the Florida prosecutor did not decline to file charges because he or she thought that someone else had committed the murder but because Broxton's statement to police could not be disproven. The fact that there was not sufficient evidence to charge Broxton of the first homicide, at that time, does not greatly diminish the weight of the Florida homicide evidence to show identity, given that the two murders occurred halfway across the country, yet Broxton knew both victims and was at the scene of both homicides.

We must assess this argument within the context of the evidence. Here, Broxton denied having been to Belmont's home, yet his DNA was found at the scene on the screwdriver that was used to tamper with the safe and the orange juice bottle on Belmont's living room floor. Broxton had possession of Belmont's van after Belmont was murdered with Belmont's things in the back. Belmont's stereo, NYU sweatshirt, and red

16

Amsterdam pen were found at Broxton's apartment. The calls between Broxton's and Belmont's phone numbers mysteriously stopped after December 5—the day that Belmont's calendar said "Darrell over." Then, after Belmont was dead, there were calls placed from one of Belmont's missing cell phones to Broxton's drug dealer and two other acquaintances of Broxton. The jury could reasonably infer that Broxton killed Belmont, attempted to open Belmont's safe, drank some orange juice, took Belmont's cell phones, and then loaded what he could into Belmont's van and drove off to pick up Hunter. This was a strong circumstantial case. Any error in the exclusion of evidence was harmless.

*The court correctly scored Broxton's 1989 Florida burglary conviction.*

At sentencing, the court scored Broxton's 1989 Florida conviction for burglary as a person felony. Broxton contends the sentencing court erred because the 1989 Florida burglary statute had a broader specific intent element than the Kansas burglary statute and the two are not comparable. He contends the sentencing court necessarily engaged in unconstitutional judicial fact-finding in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), to determine his Florida conviction was comparable to the Kansas statute.

Because courts may correct an illegal sentence at any time, this court may review Broxton's claim. See K.S.A. 22-3504(1); *Dickey*, 301 Kan. at 1027. When a constitutional challenge renders a defendant's criminal history score incorrect, the sentence based on that criminal history score does not conform to the applicable statutory provision and is illegal. *Dickey*, 301 Kan. at 1030-34. Whether a sentence is illegal is a question of law over which an appellate court has unlimited review. *State v. Moncla*, 301 Kan. 549, 551, 343 P.3d 1161 (2015).

17

Broxton's argument fails because we need not go beyond the statutory elements that made up the crimes of burglary in Kansas and Florida to determine that the crimes are comparable.

The determination of whether a defendant's prior out-of-state conviction is treated as a person or nonperson crime is based on the classification of the comparable Kansas offense in effect at the time the current offense was committed. If Kansas does not have a comparable offense, the out-of-state conviction is classified as a nonperson crime. K.S.A. 2012 Supp. 21-6811(e).

Some types of burglary in Kansas are classified as person offenses, while others are classified as nonperson offenses. At the time of Broxton's offense, burglary of a "dwelling" was classified as a person felony in Kansas. K.S.A. 2012 Supp. 21-5807(a)(1), (c)(1). In addition, aggravated burglary was classified as a person felony in Kansas. K.S.A. 2012 Supp. 21-5807(b), (c)(2). All forms of burglary in Kansas required "intent to commit a felony, theft or sexually motivated crime therein." K.S.A. 2012 Supp. 21-5807. At the time of Broxton's current offense, the Kansas statute read:

> "(a) Burglary is, without authority, entering into or remaining within any:
>> (1) Dwelling, with intent to commit a felony, theft or sexually motivated crime therein;
>> (2) building, manufactured home, mobile home, tent or other structure which is not a dwelling, with intent to commit a felony, theft or sexually motivated crime therein; or
>> (3) vehicle, aircraft, watercraft, railroad car or other means of conveyance of persons or property, with intent to commit a felony, theft or sexually motivated crime therein.
> "(b) Aggravated burglary is, without authority, entering into or remaining within any building, manufactured home, mobile home, tent or other structure, or any vehicle, aircraft, watercraft, railroad car or other means of conveyance of persons or property in

18

which there is a human being with intent to commit a felony, theft or sexually motivated crime therein." K.S.A. 2012 Supp. 21-5807.

In 1989, Florida defined burglary as:

"(1) 'Burglary' means entering or remaining in a structure or a conveyance *with the intent to commit an offense therein*, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
(2) Burglary is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in . . . if, in the course of committing the offense, the offender:
    (a) Makes an assault or battery upon any person.
    (b) Is armed, or arms himself within such structure or conveyance, with explosives or a dangerous weapon.
(3) If the offender does not make an assault or battery or is not armed, or does not arm himself, with a dangerous weapon or explosive as aforesaid during the course of committing the offense and the structure or conveyance entered is a dwelling or there is a human being in the structure or conveyance at the time the offender entered or remained in the structure or conveyance, the burglary is a felony of the second degree . . . Otherwise, burglary is a felony of the third degree, punishable as provided . . . "
(Emphasis added.) Fla. Stat. § 810.02 (1983).

Note the Florida statute contains three different degrees of burglary. We must first determine which form of burglary Broxton was convicted of.

When a statute is "divisible," i.e., it comprises multiple, alternative versions of the crime, then courts are, consistent with *Apprendi*, permitted to examine a limited class of extra-statutory materials to determine which of the statute's alternative elements formed the basis of the defendant's prior conviction. *Descamps v. United States*, 570 U.S. ___, 133 S. Ct. 2276, 2284-85, 186 L. Ed. 2d 438 (2013). The courts are permitted to look to extra-statutory materials such as charging documents, plea agreements, jury instructions, verdict forms, transcripts from plea colloquies, and findings of fact and conclusions of

19

law from a bench trial. *Dickey*, 301 Kan. at 1038. The Florida burglary statute was divisible because it contained three different degrees of burglary. Thus, the court can look at the charging document and judgment document without violating *Apprendi* to determine which form of burglary Broxton was convicted of in Florida.

The Florida charging document stated that count I is "BURGLARY OF A DWELLING" and cites to Fla. Stat. § 810.02(1) and Fla. Stat. § 810.02(3). The judgment document stated Broxton entered a plea of guilty to "Burglary of Dwelling" and cites to Fla. Stat. § 810.02(3). The judgment also specified the degree of crime as "2." Thus, Broxton was convicted of second-degree burglary. The court does not need to make any unconstitutional factual findings to determine that Broxton was convicted of second-degree burglary in Florida.

The next step is to determine the comparable Kansas offense. Second-degree burglary in Florida involved

> "entering or remaining in a structure or a conveyance with the intent to commit an offense therein . . . and the structure or conveyance entered is a dwelling or there is a human being in the structure or conveyance at the time the offender entered or remained in the structure or conveyance." Fla. Stat. § 810.02(1), (3) (1983).

Second-degree burglary necessarily involved a dwelling or a structure or conveyance with a human being in it. See Fla. Stat. § 810.02(3) (1983). Second-degree burglary in Florida is thus most comparable to a combination of K.S.A. 2012 Supp. 21-5807(a)(1) (burglary of a dwelling) and K.S.A. 2012 Supp. 21-5807(b) (aggravated burglary) in Kansas, which are both classified as person felonies. See K.S.A. 2012 Supp. 21-5807(c)(1)(A), (2). Broxton's Florida offense was correctly classified as a person offense.

20

To us, Broxton argues that the Florida statute is not comparable to any forms of burglary in Kansas because of the differing intent elements. All forms of burglary in Kansas required "intent to commit a *felony, theft or sexually motivated crime* therein." (Emphasis added.) K.S.A. 2012 Supp. 21-5807. In contrast, Fla. Stat. § 810.02 (1983) required "intent to commit an *offense* therein." (Emphasis added.)

The problem with Broxton's argument is that not all of the elements need be identical for crimes to be comparable. In *State v. Williams*, 299 Kan. 870, 874-76, 326 P.3d 1070 (2014), our Supreme Court held that the Kansas and Ohio burglary statutes were comparable despite differing intent elements. The court emphasized that "the offenses need only be comparable, not identical." 299 Kan. at 873. This determination requires a legal review of the statutes because "there is no review of the evidence surrounding the out-of-state conviction." 299 Kan. at 875. The Kansas crime that is "the closest approximation" to the out-of-state crime is the comparable offense. 299 Kan. at 873. In *State v. O'Connor*, 299 Kan. 819, 823, 326 P.3d 1064 (2014), the court stated that "[o]bviously, the comparable Kansas offense for a Florida burglary would be our version of burglary." The court went on to find that third-degree burglary in Florida was "closely comparable" to a nonperson burglary in Kansas. 299 Kan. at 825.

Recently, in *State v. Collier*, 306 Kan. 521, 525-26, 394 P.3d 1164 (2017), the court held that two aggravated burglary statutes were comparable though the 1988 version stated "intent to commit a felony or theft therein" and the 1993 version stated "intent to commit a felony, theft or sexual battery therein." Offenses may be comparable even when the out-of-state statute encompassed acts not encompassed by the Kansas statutes. Instead, the two offenses "must be 'similar in nature and cover a similar type of criminal conduct.'" *State v. Riolo*, 50 Kan. App. 2d 351, 353, 330 P.3d 1120 (2014). Here, the similar conduct is the act of entering into a dwelling or structure or conveyance with a human being in it with the intent to commit an offense.

21

The closest approximation in Kansas to Florida second-degree burglary is a combination of burglary of a dwelling and aggravated burglary in Kansas. Both are person offenses. Broxton's 1989 Florida conviction was properly scored as a person offense.

Broxton also argues that *Apprendi*, *Descamps*, and subsequent cases replaced Kansas' comparability rule with an "identical or narrower" rule so that the out-of-state offense must be identical or narrower than the Kansas offense. But Kansas has not adopted an identical or narrower rule, and *Apprendi* is not implicated by this court's comparability analysis. In *Williams*, the court explained that the determination of comparability requires a legal review of the statutes and "there is no review of the evidence surrounding the out-of-state conviction." 299 Kan. at 875. Our Supreme Court recently utilized the comparability rule in *Collier*. The court reiterated the "closest Kansas 'approximation' to [an] out-of-state statute under which [the] conviction arose was [a] comparable offense for classification purposes . . . '[f]or purposes of determining criminal history, the offenses need only be comparable, not identical.'" *Collier*, 306 Kan. at 526.

As our analysis illustrates, we can determine that the offenses are "comparable" without finding facts beyond the existence of Broxton's prior conviction or the statutory elements that made up the prior conviction.

Panels of this court in *State v. Moore*, 52 Kan. App. 2d 799, 809, 377 P.3d 1162, *rev. granted* 305 Kan. 1256 (2016), and *State v. Buell*, 52 Kan. App. 2d 818, 377 P.3d 1174, *rev. granted* 305 Kan. 1253 (2016), have also held that Kansas burglary is comparable to Florida burglary despite the different intent elements. Finally, our Supreme Court has already found Florida burglary comparable to Kansas burglary. See *O'Connor*, 299 Kan. at 823-25.

22

To conclude, we hold that the trial court did not err when it refused to give a felony-murder instruction to the jury. The evidence did not show that Belmont's murder occurred as part of the res gestae of the robbery. The court did not err when it declined to admit evidence that Broxton was not charged with the Florida homicide since it was irrelevant to the question of identity. The announcement of no information from the Florida prosecutor was relevant to consider the weight of the Florida evidence, but its nonadmission was harmless here because the jury heard Broxton's recorded statement from the Florida investigation, where he denied killing the man. Finally, the court did not err in scoring Broxton's 1989 Florida burglary conviction but did err in scoring his 1990 attempted burglary conviction in Kansas.

We affirm Broxton's conviction, vacate his sentence, and remand for resentencing.

\* \* \*

ATCHESON, J., concurring:  Although I agree defendant Darrell Broxton has failed to show trial errors undermining his convictions arising from the murder of Peter Belmont, I do not share the majority's reasoning in getting to that result with respect to the jury instruction issue. Broxton's argument impermissibly encroaches upon the authority of prosecutors to charge crimes and to have juries consider those crimes.

For his first point on appeal, Broxton says the Wyandotte County District Court erred in refusing *his* request to instruct the jury on first-degree felony murder, even though the State had charged first-degree premeditated murder. The argument fails for the simple reason that a criminal defendant has no right to have a jury instructed on crimes the State has refrained from charging, save for lesser included offenses of those crimes that actually have been charged. The State functionally has unbridled control over what to charge against a given defendant—that's the essence of prosecutorial discretion. See *State v. Williamson*, 253 Kan. 163, 165-66, 853 P.2d 56 (1993). For example, a

23

prosecutor could choose not to charge less serious crimes that might be supported by the facts in a given case to streamline and simplify the evidence or to avoid having to call disagreeable or unsavory witnesses. There might be other tactical reasons a prosecutor would proceed only on the most serious charges supported by the evidence. Whatever the reasons, the call belongs to the State. A defendant has no correlative right to insist a jury be instructed on uncharged crimes even if the trial evidence tends to establish them. That would contravene prosecutorial discretion.

Had the State chosen not to charge Broxton with counts of felony and misdemeanor theft, he could not have required the district court to instruct the jury on those crimes despite the evidence supporting them. The same is true for felony murder. Although felony murder and premeditated murder are both forms of first-degree murder, they require proof of different facts and are substantively different ways of proving the same statutory crime. Oftentimes, the evidence in a case could establish both. The prosecutor, however, retains the authority to charge one or the other or to charge each in the alternative. The defendant can't alter that exercise of discretion by insisting on jury instructions that deviate from the prosecutor's election. (Here, I presume Broxton sought an instruction on felony murder because of a sentencing anomaly: Given his substantial criminal history, he could be considered for release from prison sooner if he were convicted of either form of first-degree murder rather than second-degree murder.)

To be clear, a district court is obligated to instruct on lesser included offenses of the charged crimes supported in the evidence, even if neither side makes a request. See K.S.A. 2016 Supp. 22-3414(3). But felony murder is not a lesser offense of premeditated first-degree murder; it is a cognate or equivalent offense, so the statutory directive of K.S.A. 2016 Supp. 22-3414 does not apply. And criminal defendants are entitled to instructions on any *defenses* supported in the evidence if they so request. See *State v. Salary*, 301 Kan. 586, 592-93, 343 P.3d 1165 (2015). Felony murder is not, of course, a defense to premeditated murder.[*]

24

[*]The majority's reliance on *State v. Young*, 277 Kan. 588, 87 P.3d 308 (2004), is misplaced. The case dealt with the district court's decision to give a jury instruction on felony murder after the prosecutor pursued that theory during trial, although the information had charged only premeditated first-degree murder. 277 Kan. at 593-97. The district court's instruction tacitly amounted to an amendment of the charge. The decision had nothing to do with a defense request for an instruction on an uncharged crime or an alternative way of committing a charged crime. The *Young* court did not consider, let alone discuss, that circumstance and most certainly did not endorse granting a defense request for such an instruction.

Broxton's point on appeal fails based on those overarching principles governing criminal law and prosecutorial authority to determine what crimes to charge. The disposition of the issue requires no assessment of the evidence, so I offer no particular opinion on whether that evidence could support a charge and conviction for felony murder. I, likewise, do not join in that portion of the majority opinion.